IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 4, 2010 Session

**IN RE ISAIAH L.**

**STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES**
**v.**
**DIANNE P.**

**An Appeal from the Circuit Court for Davidson County**
**No. 09-D-315     Phillip E. Smith, Judge**

———————————————————————

**No. M2009-02455-COA-R3-JV - Filed October 29, 2010**

———————————————————————

This is an appeal from a finding of dependency and neglect. An off-duty employee of the petitioner Tennessee Department of Children's Services witnessed the respondent mother hitting the subject child in the parking lot of a retail store. After an investigation, the State filed a petition for dependency and neglect, alleging abuse based on the parking lot incident. The juvenile court determined that the child had been abused and held that the child was dependent and neglected. The mother appealed to the circuit court, which conducted a two-day trial *de novo*. After hearing the evidence, the circuit court below entered an order finding by clear and convincing evidence that the child had been abused and declaring the child to be dependent and neglected. The mother now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Anne M. Davenport, Nashville, Tennessee, for the Respondent/Appellant, Dianne P.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; and Elizabeth P. McCarter, Senior Counsel, for the Petitioner/Appellee, State of Tennessee Department of Children's Services

## OPINION

### FACTS AND PROCEEDINGS BELOW

The child involved in this action, Isaiah L., was born to Respondent/Appellant Dianne P. ("Mother") on August 2, 2003, when Mother was forty-five years old. Upon his birth, the Petitioner/Appellee State of Tennessee Department of Children's Services ("DCS") immediately took custody of the child due to Mother's history of child abuse with DCS. The child was placed in the custody of his father, Charles L. ("Father"), who was never married to Mother.

In May 2004, Mother regained custody of Isaiah. She obtained governmental services to help her raise the child, including assistance from Help Us Grow Successfully ("HUGS"), a government program that provides services to women who have children from birth to age six. At some point, the child was diagnosed as developmentally delayed, and engaged in severe tantrums and episodes of acting out. The child was provided therapy and began kindergarten in special education classes. Mother struggled to deal with Isaiah's special needs due to her own physical and mental challenges.

The incident that gave rise to the instant petition occurred on November 4, 2008, when the child was five years old. On that day, Mother had taken Isaiah shopping at a retail shoe store. Inside the store, the child was non-compliant, running around in the store, and Mother was unable to gain control of him. Mother went out to the store parking lot to wait for Isaiah, and asked a couple of passersby to retrieve the child for her.

At that point, an off-duty employee of DCS, Kenya Clark ("Clark"), arrived in the shoe store parking lot. Mother's behavior attracted Clark's attention; the trunk of Mother's car was open, and Mother was sitting on the back end of her car with a cane, yelling at no one in particular and acting oddly. Clark saw the child come out of the store and approach Mother in the parking lot. Mother then grabbed the child and repeatedly struck him, and yelled at him as he tried to get away. The number and location of the blows to the child is disputed. Alarmed by what she was seeing, Clark approached Mother and asked her to stop hitting the child. When Clark identified herself as a DCS employee, Mother told Clark that she was leaving, and began putting the child in her car. Clark informed Mother that the police were on their way and that she needed to wait until the police arrived. When the police arrived, they interviewed Mother, Clark, and others on the scene. Subsequently, Mother was allowed to take the child home, with the understanding that DCS would conduct further investigation.

Later that evening, DCS investigator Latasha Bryant ("Bryant") went to Mother's home to investigate the incident Clark witnessed. She observed fresh linear marks and whelps on

Isaiah's body. Bryant interviewed Isaiah and Mother separately, with Isaiah first. The child told Bryant that Mother had caused the marks Bryant observed by striking him repeatedly with a "twitch." When Bryant then interviewed Mother, she was hostile to Bryant, accusing DCS of wanting to take Isaiah from her as it had taken her other children. She denied striking the child and told Bryant that the marks were on Isaiah after he returned from a visit with Father, intimating that Father was responsible for them. Isaiah, in a nearby bedroom, apparently overheard Mother's statement, and ran into the room where Bryant was interviewing Mother and said, "No, Mommy, you did it." Mother urged Isaiah to tell Bryant that Father was responsible for his wounds, but the child insisted, "No. Mommy you did it."

On November 7, 2008, DCS filed a petition in the Davidson County Juvenile Court for custody of the child, with a request for emergency removal and for child support. After an initial hearing, the Juvenile Court granted the DCS petition on the same day. The Juvenile Court appointed a guardian ad litem ("GAL") for the child, and counsel was appointed for Mother. The same day, DCS conducted a team and family meeting on Isaiah, after which the child was placed in the custody of Father, who had been exercising regular visitation pursuant to a Juvenile Court visitation order entered in 2004.

The Juvenile Court conducted a trial on December 9, 2008, in which it heard testimony from numerous witnesses. The appellate record does not include a transcript of the Juvenile Court proceedings, but it indicates that the Juvenile Court heard testimony from Clark, Bryant, the child's teacher, the child's therapist, and the HUGS nurse who had assisted Mother with Isaiah. Mother did not testify. After hearing the testimony, on December 15, 2008, the Juvenile Court entered a lengthy order with detailed findings. The Juvenile Court found by clear and convincing evidence that the child had been subjected to abuse by Mother and was a dependent and neglected child. Pursuant to Tennessee statutes, Mother appealed the findings of the Juvenile Court to the Davidson County Circuit Court.[1]

On May 19 and 20, 2009, the Circuit Court conducted a *de novo* trial. The Circuit Court heard testimony from essentially the same witnesses who testified before the Juvenile Court. In addition, the Circuit Court heard testimony from Mother.

DCS employee Clark testified at the outset, describing what she witnessed in the shoe store parking lot on November 4, 2008. Clark said that, as she drove into the parking lot, she saw a woman whom she identified as Mother; the trunk of her car was open and she was sitting on the back end of her car. Clark noticed that Mother had a cane. Mother was speaking

---

[1] Tennessee Code Annotated § 37-1-159 governs appeals from the juvenile courts. It provides in pertinent part that "any appeal from any final order or judgment in . . . [a] dependent and neglect proceeding . . . may be made to the circuit court," to be reviewed *de novo*. T.C.A. § 37-1-159(a) (2005).

loudly at no one in particular and "behaving rather wildly and bizarre." Clark described it as "belligerent talking. Just a bunch of loud cussing." At that point, the child was nowhere in sight. Clark then saw the child exit the shoe store. Seeing him, Mother motioned to the child to come to her, saying "I'll whoop your ass," and similar things, as the child walked slowly and tentatively toward her. As the child approached, Clark said, Mother grabbed the child, knocked him to the ground, and dragged him across the pavement. She then picked him up and proceeded to hit him with an open hand with "all the force she could muster" on his head, back, arms, and legs, wherever she could reach. The child was screaming and crying, and asking Mother to stop, and as he would get up and try to get away, Mother would grab him and hit him some more. Clark said that she could hear the blows to the child's body from several feet away, and she estimated that Mother hit the child twenty or more times.

When Clark saw what Mother was doing, she got out of her car, approached Mother, and asked Mother what she was doing. While still hitting the child, Clark said, Mother replied, "Beating this child." Clark said that Mother did not stop hitting the child until Clark told her that she worked for DCS and asked if she could help. Mother then told Clark, "I can't do anything with him," and she asked Clark to help her get the child into Mother's car. Clark told Mother that she could not leave with the child because the police had been called[2] and she needed to wait for the officers. As Mother continued to try to get the child into her car so that she could leave, Clark warned Mother that she had taken a photograph of her vehicle license plate, so that she would later be located if she chose to leave the scene. Clark also told Mother that she was going to file a report with DCS on the incident, because Mother had been hitting her child and the child appeared to be afraid of Mother.

Clark testified that it took the police about forty minutes to arrive. As they waited, Clark said, Mother continued to act bizarre and belligerent. Mother cursed Clark and rejected her offer of DCS services; she told Clark this was because Clark was rich and Mother was not, and that DCS was jealous of Mother and that DCS wanted to take her child. Mother continued to pace about and yell, was at times incoherent, and had foam at the corners of her mouth. Clark attempted to calm Mother, to no avail.

As they waited for the police to arrive, Clark took the child aside and spoke to him. Clark observed that the child had fresh bruises on his knees and arms, as well as "scrapes and things" on his head, arms, and legs. The child lifted his shirt and revealed linear "whelp-like marks" on his stomach and back, and she saw other marks on his forehead. When Clark asked the child where the marks came from, he stated, "My mommy hit me with a twitch."

---

[2]Clark's testimony was somewhat unclear on whether she told Mother that the police had already been called or if she told Mother that she had photographed her car license number and was going to call the police.

He told Clark more than once that his mother had caused his injuries, and gave no other explanation for them. The child told Clark that he was afraid of Mother.

Clark testified that, when the police arrived, she described to them what she had witnessed. The officers spoke to other bystanders who were on the scene. Ultimately, Clark said, the officers allowed the child to go home with Mother, explaining their decision to Clark by saying that parents discipline their children in different ways. After that, Clark called DCS to make a referral on Mother; she reported the situation as one that required immediate attention.

DCS investigator Bryant testified next. On the evening of the incident, Bryant went to Mother's house with two police officers to investigate. Bryant said that, when she arrived, Mother immediately said that she knew DCS would be coming, because DCS had a preconceived agenda and had "always wanted her children." When Bryant told Mother that she wanted to interview the child alone, Mother initially resisted, but then relented when Bryant said that one of the police officers would be present in the interview as well.

Bryant first interviewed Isaiah in a bedroom, out of Mother's presence. When Bryant asked Isaiah about the scratches on his face, he said that Mother had inflicted them. When she asked if he had any other marks, the child lifted his shirt and showed linear whelps on his chest and stomach; Bryant also noticed that he had marks on his legs and scratches on his knees. The child said that all of his wounds had been caused by Mother, using her "twitch." He explained that a "twitch" was like a tree branch. Some of Isaiah's marks and scabs were older, but the scratches on his knees appeared to be fresh. When Bryant asked Isaiah what happened earlier that day, he said that he had gotten into trouble and Mother had spanked him. Bryant took photographs of the marks on Isaiah's body, which were entered into evidence.

After Bryant interviewed Isaiah, she then interviewed Mother, leaving Isaiah in the bedroom. Bryant said that interviewing Mother was difficult, because Mother interrupted Bryant frequently and asked Bryant several times to leave the house. When Bryant would prepare to leave, Mother would then stop her and agree to answer more questions. This apparently happened repeatedly.

In the course of the interview, Mother told Bryant that she had five other children, one in the custody of his father, two taken into DCS custody who had aged out of the system, and another two to whom Mother's rights had been terminated. Each of the five children had at one time or another been removed from Mother's custody by DCS. Mother initially told Bryant that some of the other children "went to the Judge" and lied about being abused. Later, in the same interview, Mother admitted to Bryant that she had abused her older

-5-

children, but "[swore] to God that she did not abuse Isaiah." Bryant stated that it was difficult for her to follow the thread of Mother's conversation, because Mother would jump back and forth between discussing issues regarding Isaiah, and things that happened with her other children in years prior.

In response to Bryant's questions, Mother told Bryant that she did not cause the marks Bryant had seen on Isaiah's body. Mother indicated that she first saw the marks when Isaiah returned from a visit with his father. Mother intimated to Bryant that Father had caused the bruises and marks on the child. At that point, Isaiah ran out of the bedroom and blurted out, "No, Mommy you did it." Mother then went to Isaiah and told him to tell Bryant that Father had caused the marks, but the child insisted, "No. Mommy you did it." Bryant then asked one of the police officers to stay in the bedroom with Isaiah so that he could not further interrupt her interview with Mother.

After that, Mother speculated to Bryant that Isaiah may have caused the bruises himself by banging his head against a table and throwing his body against the table or wall. Mother claimed that she had actually witnessed Isaiah doing such things. Mother asserted to Bryant that Isaiah had a disability called disturbed emotional disorder, and that, due to this condition, he frequently "makes things up" and inflicts his own injuries. Bryant testified that she did not believe Mother's assertion that the child had inflicted his own injuries, because the marks on him were not consistent with the conduct Mother described.

Bryant testified that Mother initially told her that she sometimes used the back of a hairbrush as an instrument to discipline Isaiah. Later in the interview, however, Mother explained that she only used the hairbrush in the course of playing a game with the child's hands. Mother denied ever using a switch or a belt to discipline the child. Mother told Bryant that she had attended parenting classes at the behest of DCS on prior occasions, and she learned in those classes that using a belt or a switch was an inappropriate way to discipline a child.

Bryant said that when she told Mother that Isaiah might have to be placed in DCS protective custody, Mother became very upset. She told Bryant that she is poor, and asserted that DCS was trying to keep her poor, in that, if Isaiah were taken into DCS custody, Mother could not survive because she would no longer receive the child's disability checks.[3] Bryant testified that Mother said that "there would go her livelihood." In addition to the child's disability checks, Mother said she received child support from Father, which she likewise would no longer receive if the child were removed from her custody. Mother told Bryant that she received disability benefits on her own behalf, because she had trouble walking without a

---

[3]The record does not show the precise reason that the child was determined to be disabled, but indicates that the child was born prematurely, was developmentally delayed, and had behavioral issues.

cane, but apparently believed those benefits were insufficient. In response to Bryant's inquiry, Mother denied any mental health issues.

After the interviews, Bryant arranged for removal of Isaiah from Mother's home that evening. Bryant said that she attempted to work out a temporary arrangement that would avoid foster care, but that, initially, foster care was the only option. On November 7, 2008, DCS filed the dependency and neglect petition in the Juvenile Court.

On the same day that the dependency and neglect petition was filed, Bryant testified, DCS conducted a child and family team meeting with Mother and Father to determine where Isaiah should be placed. At that meeting, Mother stated that, due to her health problems, she had been asking Father to take custody of the child. After the meeting, the child was placed in the custody of Father, where he has remained since that time. Bryant testified that she offered Mother DCS services to help her prepare to reacquire custody of Isaiah, but Mother refused those services and did not call Bryant later to ask for such services. Since the child has been in the custody of Father, Bryant stated, there had been no reports of abuse, nor any DCS referrals on Father.

At some point, Mother called Bryant to tell her that, since Isaiah was born, she had been working with a HUGS nurse, Dianne Bauer. Mother indicated to Bryant that Bauer could corroborate that Isaiah would at times bang his head on a table. Bryant also discovered that Isaiah had been treated for behavioral issues at Centerstone of Nashville, beginning in July 2007. Bryant's involvement in Isaiah's case ended after the child was brought into custody, and the case was transferred to another caseworker.

Several witnesses were called to testify on Mother's behalf. Willy Wyatt ("Wyatt"), an officer with the Shelby County Sheriff's office, was off-duty and at the shoe store as a customer on the day of the incident at issue. Wyatt testified that he saw Isaiah "running all over the place" in the shoe store, and he also saw Mother's unsuccessful attempts to get the child to come to her. Wyatt described Isaiah as "hyper and non-compliant," and said that Mother seemed handicapped and unable to move as quickly as the child. Later, after Wyatt had gone to the parking lot and gotten in his vehicle, he looked up and saw Mother hitting Isaiah in the parking lot, and the child was crying. Wyatt said that he saw Mother hit the child three or four times. He characterized it as "a little more than spanking," and said Mother's behavior was "a little over the top" because it was done in public. Wyatt did not recall hearing Mother directing profanity toward the child. He commented that, although he might "disagree with it," he generally chooses not to get involved in parent/child disputes unless he feels that the child is really in danger. Wyatt said that he did not intervene in this instance because he did not perceive that Isaiah was in danger. Wyatt saw Clark arrive and

intervene, and he stayed on the scene until the police arrived, in order to help Clark if the situation were to escalate. He gave a statement to the police when they arrived.

Officer Guy Struder ("Officer Struder") was one of the police officers who responded to Clark's call to the police. When he arrived at the shoe store parking lot, Officer Struder testified, he spoke with Mother, Clark, Wyatt, and other persons on the scene. By the time he arrived, some thirty minutes after receiving the call, Isaiah did not appear to be injured, and he was sitting on the curb next to Clark; he did not look like he had been upset or crying. Officer Struder stated that, after his investigation, he, Mother, and Clark all agreed that Mother could take the child home, with the understanding that DCS would conduct a further investigation of the incident.

Dianne Bauer ("Bauer"), the HUGS nurse who assisted Mother and Isaiah, testified on Mother's behalf. Bauer stated that, in August 2003, just after Isaiah was born, she received a referral from Vanderbilt Hospital to offer assistance to Mother by providing education about infant care, nutrition, growth, and development through an in-home program. Initially, Isaiah was in Father's custody. When Mother obtained custody in May 2004, however, she called Bauer to accept the assistance previously offered. Bauer was involved with Mother's case from May 2004 until November 2008, when Isaiah was removed from Mother's custody. Bauer began by visiting once per week, but later reduced her visits to once or twice a month.

Bauer testified that Isaiah had bad temper tantrums, and she recommended that Mother seek help at Centerstone. Bauer witnessed one of Isaiah's bad tantrums in May 2008, when the child was four years old. Bauer said that she was having a pleasant visit with Isaiah when he suddenly "just got out of control and started screaming, biting, and hitting" and pulled out his own baby tooth. In response, Bauer said, Mother held Isaiah for a few minutes, and the child calmed down. Bauer reported the incident to the child's case manager at Centerstone. On another occasion, in October 2008, when Bauer was in her car waiting for Mother and the child to arrive home from school, she saw Isaiah get out of Mother's car and begin "just running everywhere." Mother became frustrated because her mobility problems prevented her from running after the child, so Bauer ran after him out of concern that Isaiah might get hit by a car. It took both Bauer and another bystander to get Isaiah into Mother's apartment, while he was kicking and screaming all the way. When they arrived at Mother's home, Isaiah was kicking, screaming, and biting Mother, and he kicked Bauer in the shins, yelling, "Leave me alone." Bauer said that Mother just "popped" Isaiah gently on the bottom a couple of times, and then grabbed Isaiah and held him to restrain him.

In response to questions, Bauer testified that Isaiah did not exhibit fear of Mother; in fact, "[j]ust the opposite." Bauer observed that Isaiah "was extremely attached to" Mother, and

she had no reason to suspect that Mother abused the child. Bauer said that Mother followed up on all of her recommendations, and Bauer never saw Mother do anything inappropriate to the child.

Bauer stated that although Mother did not ask for mental health services, Bauer was aware that Mother had received mental health services when she was a teenager. Bauer was concerned that Mother suffered from anxiety or depression, but Bauer could do nothing more than inform Mother about services that might help her. Bauer did not believe that Mother's mental health issues interfered with her ability to care for Isaiah.

Latoya Anderson ("Anderson"), Isaiah's kindergarten teacher for the school year beginning August 2008, testified as well. Anderson said that Isaiah began kindergarten as a special education student because he had been diagnosed with "developmental delay."[4] While Isaiah was a little more active than the other children, Anderson said, he generally was "good-natured and cooperative." Anderson saw nothing about Isaiah that caused her to believe that he was the victim of abuse or neglect.

Anderson indicated that, since Isaiah began living with Father, he has rapidly progressed in his behavior and his schoolwork. At the beginning of the school year, Isaiah was wearing a pull-up style diaper, but at the time of trial, he was no longer wearing one. Also, she stated, Isaiah no longer needed special education classes, and he was expected to progress to a regular first grade class. Anderson attributed Isaiah's progress to the consistency of his routine while living with Father.

The Circuit Court also heard testimony from Tanisha Marie Baldwin ("Baldwin"), a social worker who was Isaiah's therapist at Centerstone. Baldwin had seen Isaiah only a few times since she was assigned the case in August 2008; a different therapist worked with Isaiah prior to that. Baldwin said that she did not see Isaiah after he was removed from Mother's home and placed with Father. Baldwin testified that Isaiah had been diagnosed with adjustment disorder and developmental delay, based on Mother's reports to the prior therapist. During one thirty-minute visit with Isaiah, Baldwin said, he was "out of control," and "all over the lobby, all over the treatment room, couldn't be controlled." Baldwin initially said that she saw no signs that Isaiah was an abused child, but later conceded that it had not occurred to her that Isaiah's bad behavior could be a response to abuse.

Finally, Mother testified on her own behalf. Mother said that, from the time she gained custody of Isaiah in May 2004, she had been attentive to his special needs. She took the child

_____

[4]Isaiah received speech and language therapy, as well as occupational therapy to learn how to use writing utensils and scissors.

to a speech therapist when he was three years old, and began taking him to Centerstone twice a month beginning when he was four years old. Mother said that Isaiah began acting out after his visits with Father, telling Mother that he wanted to live with Father. Mother described severe tantrums, kicking Mother and pulling her hair. Mother said that she always encouraged the relationship between the child and Father. Mother testified that, at DCS direction, she attended parenting classes, at which she learned that she should never use a belt or switch to discipline a child.

Mother testified about the shoe store incident on November 4, 2008. Mother explained that, when she was ready to leave the shoe store, Isaiah refused to leave with her. Mother went outside to wait for him, and she asked two passersby to go in and retrieve Isaiah for her. She claimed that, while she was waiting, she was simply at her car with the radio on, singing. When Isaiah came out, Mother conceded, she was "kind of loud," asking him why he did not come when she instructed him. Mother testified that she "grabbed him, and . . . whipped him three or four times" on his bottom. She explained that she grabbed Isaiah because he would not obey her, and he continued to try to fight with her. At that point, Mother said, Clark approached her and told her she could not do that. Mother denied Clark's assertion that she had hit Isaiah twenty times. Mother said that, when Clark approached, she explained to Clark that she was spanking the child, not beating him.

Mother testified that she did not have first-hand knowledge of how Isaiah obtained the marks on his body, but asserted that he came home with the marks after visiting with Father. She stated that some of the marks reportedly resulted from Isaiah's attempt to ride a bike while with Father, and other marks came from playing with other children while in Father's care. Mother said that she did not know why Isaiah would say that she caused the marks on his body.

Mother told the Circuit Court that she was diagnosed with diabetes in November 2008, just after the incident in question. By then, she said, she was experiencing numbness in her feet due to the poor circulation caused by the diabetes. Prior to that, Mother said, she had had no physical problems.

Asked about any current mental illness, Mother responded that she had anger management issues stemming from her anger at DCS for removing her children from her custody. In response to a question about whether she was receiving disability benefits, Mother said that she was receiving such benefits because of her mental health history. She explained that she was placed in a mental institution in the late 1970's and early 1980's, from the time she was 15 or 16 years old until she was 21 or 22 years old. She stated that she had severe problems with her family, particularly her mother. Mother confirmed that she was currently considered to be disabled as a result of her mental health history. After being released from the mental

health facility in her twenties, Mother said, the next time that she saw a mental health professional was in 2003 or 2004, when DCS took custody of her older children. Mother indicated that, when she saw a therapist at Centerstone in March 2009, she was diagnosed with a mental health disorder. When asked what the diagnosis was, Mother replied, "I don't know. I don't know. . . . I don't know what they diagnosed me with."

As follow up, the GAL asked Mother, "[D]o you know if you've been diagnosed with schizophrenia?" This question drew an immediate objection from Mother's counsel, who argued that the question was impermissible "if we're taking about when she was a child." The objection was overruled. Mother denied that, in the past, her mental health diagnosis was schizophrenia. She was then asked, "Have you been told what it [your diagnosis] was when you were at MTMHI [the mental institution]?" Mother answered, "When I was at Central State [mental institution] I was told by a doctor that I was, but since I've been out, no."

Mother acknowledged that, as of the time of trial, Isaiah was no longer considered disabled by the Social Security Administration, and that the child's behavior had improved since being placed with Father. She surmised that Isaiah was doing well because he "wants to be with his dad."

During the trial, in the course of marking certain documents as trial exhibits, the Circuit Court indicated that the Juvenile Court order being appealed should be made an exhibit. Counsel for Mother objected, arguing that the trial in Circuit Court was to be conducted *de novo*, without deference to the decision of the Juvenile Court. The Circuit Court overruled the objection, and directed that the Juvenile Court order be marked and admitted into evidence as Exhibit 4. The Circuit Court noted that Rule 36(e) of the Tennessee Rules of Juvenile Procedure provides that the entire juvenile court record must be sent to the circuit court when an appeal is perfected. Therefore, the Circuit Court held that "the statute and the rule contemplates [sic] that the Court consider the findings and recommendations" of the Juvenile Court judge.

### CIRCUIT COURT DECISION

On September 4, 2009, the Circuit Court entered an order granting the DCS dependency and neglect petition, finding by clear and convincing evidence that Mother had perpetrated abuse on Isaiah and that the child was dependent and neglected, pursuant to Tennessee Code Annotated § 37-1-102(b)(1)[5] and (b)(12)(B)(F) & (G).[6] In its order, the Circuit Court

---

[5]Section 37-1-102(b)(1) states:

(continued...)

reviewed the evidence and made detailed findings of fact. It held specifically that Clark and Bryant were "credible and believable" witnesses, and that their testimony was the basis for the dependency, neglect, and abuse determination. The Circuit Court stated that the testimony of Officer Struder, Bauer, Anderson, and Baldwin had no bearing on the Court's decision, because they did not witness the November 4, 2008 incident that led to the filing of the petition. The Circuit Court found that Wyatt's testimony was credible, but that his testimony actually "bolster[ed] the DCS claim." The Circuit Court found that Mother was not a credible witness, noting specifically that she was evasive when asked about her mental health, and commented that it had "serious concerns about [Mother's] mental health." The Circuit Court explained, "[Mother] testified that she was last treated for mental health issues in 2003. However, [Mother] further testified that she recently underwent a mental health evaluation at Centerstone but could not remember her diagnosis." The Circuit Court further noted that Mother could not explain why Isaiah would accuse her of hitting him, or offer any motivation for Clark to lie in her testimony. Overall, the Circuit Court found that Mother "lacks credibility and that Kenya Clark accurately described the events of November 4, 2008

---

[5](...continued)

> (b) As used in this part, unless the context otherwise requires:
>
> (1) "Abuse" exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker . . . .

T.C.A. § 37-1-102(b)(1) (Supp. 2009).

[6]Section §7-1-102(b)(12) states in pertinent part:

> (12) "Dependent and neglected child" means a child:
>
> . . .
>
>> (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;
>>
>> . . .
>>
>> (F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;
>>
>> (G) Who is suffering from abuse or neglect . . . .

T.C.A. § 37-1-102(b)(12)(B), (F), & (G).

to the Court." The Circuit Court stated that Mother's history with DCS was not considered as a relevant factor in the Court's decision.

Based on the evidence, the Circuit Court concluded that "the Mother's repeated blows to this child constitutes acts of physical abuse."[7] It held that it was in the best interest of the child to be removed from Mother's custody, and found that Isaiah could not be returned to her custody until she met the provisions of Tennessee Code Annotated § 37-1-130(c).[8] Mother later filed a motion to alter or amend the judgment, which was denied. Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues that the Circuit Court erred in allowing the hearsay testimony of Mother on cross-examination regarding her diagnosis of schizophrenia as a teenager. Mother argues that this error constitutes grounds for reversal because it adversely affected Mother's

---

[7]The Circuit Court found that DCS had not put forth clear and convincing evidence to support its allegations that Mother caused the older injuries to Isaiah.

[8]Section 37-1-130(c) provides:

> (c) If the child is found to be dependent and neglected under § 37-1-102(b)(12)(G) as a result of brutality or abuse, the court shall not return the child under subsection (a) or § 37-1-139(b), (d), or (e) to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse until the court has received and considered reports and recommendations prepared in light of the possible return of the child by:
>
>> (1) The commissioner of children's services, if the person has been found to have committed severe child abuse, or, if there has been no such finding, by the commissioner's designee having a master's degree in social work or equivalent training and experience; and either, as the commissioner deems appropriate;
>>
>> (2) A psychiatrist or, in the alternative, a physician and a psychologist, based on professionally appropriate examinations of the child and of the person who engaged in or failed to protect the child from the brutality or abuse; or
>>
>> (3) A multi-disciplinary protective services team of the department of children's services based on professionally appropriate examinations of the child and of the person who engaged in or failed to protect the child from the brutality or abuse.

T.C.A. § 37-1-130(c) (Supp. 2009).

credibility, an important factor in the Circuit Court's assessment of the evidence in this case. In addition, Mother argues that the Circuit Court erred in permitting the Juvenile Court's December 15, 2008 order to be entered into evidence as an exhibit at trial. Mother contends that entering the order into evidence gave it undue importance, particularly in light of the fact that the Circuit Court's review is to be *de novo*, with no deference given to the Juvenile Court's decision.[9]

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Dependency and neglect proceedings are governed by statute in Tennessee. The Juvenile Court has "exclusive original jurisdiction" to determine whether a child is dependent and neglected. § 37-1-103(a)(1) (Supp. 2009). The term "dependent and neglected child" is defined by statute:

> "Dependent and neglected child" means a child:
>
> (A) Who is without a parent, guardian or legal custodian;
>
> (B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;
>
> (C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

---

[9]Mother argues that the finding of abuse, and the resulting finding of dependency and neglect, should be reversed. She does not appear to argue that she is entitled to regain custody of the child based on her satisfaction of the requirements in Tennessee Code Annotated § 37-1-130(c).

(D) Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E) Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse[10] or neglect;

(H) Who has been in the care and control of an agency or person who is not related to such child by blood or marriage for a continuous period of eighteen (18) months or longer in the absence of a court order, and such person or agency has not initiated judicial proceedings seeking either legal custody or adoption of the child; or

(I) Who is or has been allowed, encouraged or permitted to engage in prostitution or obscene or pornographic photographing, filming, posing, or similar activity and whose parent, guardian or other custodian neglects or refuses to protect such child from further such activity . . . .

T.C.A. § 37-1-102(b)(12) (footnote added). An allegation that a child is dependent and neglected must be established by clear and convincing evidence. T.C.A. § 37-1-129(c) (2005). For evidence to meet the clear and convincing standard, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). Clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

---

[10]Another statute provides that "abuse" exists when a minor child "is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker." T.C.A. § 37-1-102(b)(1).

Under Tennessee Code Annotated § 37-1-159(a), an appeal from the juvenile court's decision on a dependency and neglect petition is to be heard by the circuit court. This statute provides that the appeal is *de novo*: "The juvenile court shall be a court of record; . . . and any appeal from any final order or judgment in . . . [a] dependent and neglect proceeding, filed under this chapter, may be made to the circuit court that shall hear the testimony of witnesses and try the case *de novo*." T.C.A. § 37-1-159(a) (2005).

In light of the clear and convincing standard of proof, on appeal, this Court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). "If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary." *Cornelius v. DCS*, 314 S.W.3d at 902, 907 (Tenn. Ct. App. 2009) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)). On appeal of the Circuit Court's decision to this Court, we review the Circuit Court's findings of fact *de novo* on the record, presuming the factual findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). The appellate court then determines whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establishes all of the requirements elements. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). "Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review *de novo* with no presumption of correctness." *Cornelius*, 314 S.W.3d at 907.

## ANALYSIS

On appeal, Mother argues that the Circuit Court's finding of abuse, and the resulting finding of dependency and neglect, must be reversed, because the Circuit Court committed reversible error in (1) permitting testimony by Mother on cross-examination about an earlier diagnosis of schizophrenia, and (2) entering the Juvenile Court's dependency and neglect order as an exhibit at trial. We address each of these in turn.

## Schizophrenia

At trial, the objection of Mother's counsel to the testimony regarding her alleged history of schizophrenia was based on relevancy, because it was "told to a child many, many years ago." A trial court's decision to admit testimony based on relevancy is reviewed for an abuse of discretion. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). In her motion to alter or amend, and on appeal, Mother claims that the testimony was inadmissible hearsay, and

that Mother had no personal knowledge of her diagnosis. A trial court's determination as to whether a statement is hearsay or whether it is, nevertheless, admissible is also reviewed for an abuse of discretion. *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001).

At trial, Mother testified without objection about her commitment to a mental institution from her late teens through her early twenties. She also testified that she was, at the time of trial, receiving disability benefits based on the diagnosis she received from that institution. Mother did not volunteer either her diagnosis or the circumstances that led to her long stay at the mental institution. As followup to her testimony, the GAL asked Mother directly whether she had been diagnosed with schizophrenia during her time in the institution. As noted by the Circuit Court, Mother's responses to these inquiries on her mental health could fairly be characterized as "evasive."

Under the circumstances of this case, Mother's prior mental health diagnosis was clearly relevant. Mother was, at the time of trial, still receiving disability benefits based on the diagnosis she received in her prior institutionalization. This testimony by Mother, offered without objection, clearly tied her prior diagnosis to her current status as disabled due to her mental health. Moreover, both Clark and Bryant, whose testimony was credited by the trial court, gave testimony from which it could be inferred that Mother appeared mentally or emotionally unbalanced in the shoe store parking lot on November 4, 2008, and at the DCS investigation at her home that evening.

In light of these facts, if Mother chose to be less than forthcoming about her mental health status, then questions from opposing counsel were to be expected. Assuming *arguendo* that the question and answer at issue implicate hearsay considerations, we find that the admission into evidence of Mother's brief mention of a schizophrenia diagnosis was not an abuse of discretion.

Moreover, even if the admission of this evidence was error, we find the error to be harmless under the circumstances. In its final decision, the Circuit Court indicated that it was Mother's evasiveness in response to questions about her mental health, rather than any substantive testimony about the issue, that persuaded the Circuit Court that Mother's testimony on the events of November 4, 2008, was not credible. Therefore, we conclude that permitting Mother to answer a question on cross-examination about her childhood diagnosis of schizophrenia, if error, was harmless when considered in the overall context of the two-day trial. *See Gonzoles v. Long*, No. W2008-02605-COA-R3-CV, 2009 WL 3321304, at *5 (Tenn. Ct. App. Oct. 15, 2009) (citing Tenn. R. App. P. 36(b)). We decline to reverse the Circuit Court's finding on this basis.

**Juvenile Court Order**

Mother also argues that the Circuit Court erred in directing that the Juvenile Court order be entered into evidence as a trial exhibit. She contends that this unduly elevated the importance and persuasiveness of the Juvenile Court order, and undermined the statutory scheme providing for a *de novo* review by the Circuit Court.

As we have noted, Tennessee Code Annotated § 37-1-159(c) requires the juvenile court to "cause the entire record in the case, including the juvenile court's findings" to be "taken forthwith to the . . . circuit court whose duty it is . . . to set the case for an early hearing." T.C.A. § 37-1-159(c). The circuit court is to "hear the testimony of witnesses and try the case *de novo*." T.C.A. § 37-1-159(a). On appeal, the record of the juvenile court must be provided to the circuit court. T.C.A. § 37-1-159(c). However, the circuit court is not limited to that record. "On the contrary, the circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court, but under Tenn. Code Ann. § 37-1-159(c) must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding." ***Cornelius***, 314 S.W.3d at 906 (citing ***DCS v. T.M.B.K.***, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006)). A *de novo* trial is "[a] new trial on the entire case – that is, on both questions of fact and issues of law – conducted as if there had been no trial in the first instance." ***Id.*** (citing ***Kissick v. Kallaher***, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006)).

In the case at bar, it was appropriate for the Circuit Court to consider the entire Juvenile Court record, including the Juvenile Court's order disposing of the case, in addition to the evidence submitted in the *de novo* trial before the Circuit Court. ***See id.*** In light of the fact that the Juvenile Court's order was a part of the record before the Circuit Court, entering the order as an exhibit at trial simply made the order available to the Circuit Court in two alternative ways.[11] Mother has cited to this Court no authority to the contrary. Furthermore, the record shows clearly that the Circuit Court gave careful consideration to all of the testimony presented in its *de novo* trial on the DCS petition. Therefore, we reject Mother's argument that the Circuit Court committed reversible error in this regard.

---

[11]We note that the Circuit Court may have directed for the Juvenile Court order to be entered into evidence as an exhibit so that it could be easily located. In this case, the Juvenile Court record is comprised of orders, pleadings, and other documents, all stamped "Vic Lineweaver, Juvenile Court Clerk," in random order, with no apparent organization or indication of completeness. Such lack of organization renders the Juvenile Court record of limited use to a reviewing court, either the Circuit Court or this Court.

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Dianne P., for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE