FILED

07/03/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2017

IN RE YVONNE R.

Appeal from the Circuit Court for Cumberland County
No. 2016-CV-6081 Jonathan L. Young, Judge

_____

No. E2016-02246-COA-R3-JV
_____

A circuit court adjudicated a child dependent and neglected because her mother's mental incapacity rendered the Mother unfit to properly care for the child. Upon review, we conclude that the circuit court's decision is supported by clear and convincing evidence, and thus, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Cynthia S. Lyons, Cookeville, Tennessee, for the appellant, Renee R.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Cynthia Fields Davis, Crossville, Tennessee, Guardian Ad Litem.

**OPINION**

**I.**

After a juvenile court adjudicated her child dependent and neglected, the child's mother, Renee R. ("Mother"), appealed to the Circuit Court for Cumberland County, Tennessee. The court conducted a de novo hearing on July 6 and September 13, 2016. The following proof was presented.

## A.

On September 21, 2015, Cumberland County law enforcement performed a welfare check on Yvonne R., at the request of her father, who lived out of state. At the time, 11 year-old Yvonne was at home with Mother. When law enforcement arrived, the officers discovered that Mother and Yvonne had been involved in an altercation and that Mother had hit the child three times with a plastic jump rope. The officers saw raised marks on the child's arm and thigh. Mother admitted that she had struck the child, and when interviewed, Yvonne reported she had been hit before. When the officers attempted to place Mother under arrest, she became "very agitated," kicked one of the officers, and otherwise refused to cooperate. Ultimately, Mother was arrested for child abuse, domestic violence, and resisting arrest and was taken to jail.

Upon her arrest, a protective order was issued prohibiting any contact between Mother and the child. Mother had sole custody of Yvonne; she had never married Yvonne's father, Charles M. ("Father"). Because Mother reported that she had no friends or family members in Tennessee, the Tennessee Department of Children's Services ("DCS") took emergency custody of the child that same day. *See* Tenn. Code Ann. § 37-1-113 (2014).

A DCS investigator interviewed Mother and Yvonne on the day of the incident. The investigator saw the welts left by the jump rope and heard Yvonne's description of events.[1] According to Yvonne, Mother typically hit her one to three times a week. The DCS investigator testified that Mother told several versions of the events before finally claiming that she only struck the child in self-defense.

After the protective order was lifted, DCS arranged for Mother to have supervised visitation with Yvonne at the DCS offices. Mother arrived for her first visit on October 20, 2015. Even though she was informed that it was not possible, Mother repeatedly insisted that Yvonne was coming home that day. While it was apparent that both Mother and Yvonne were happy to see each other, Mother spent the visit pressuring Yvonne to write a letter to the judge explaining that the whole situation was a misunderstanding and requesting to go home with Mother.

The next supervised visit occurred on October 29. According to the case manager, before the visit, Mother called the DCS office several times to tell them that she planned to take Yvonne home with her that day. As a precaution, DCS requested a police officer be present for the visit. When Mother arrived, the case manager again explained that

---

[1] The judge spoke to Yvonne in chambers on both hearing dates. Both times she assured the judge that she loved Mother and was not afraid of her. At the July hearing, Yvonne told the judge that the jump rope incident was precipitated by a dispute with her mother over her clothing choice. She called Father in the hopes that he could calm Mother down. By September, Yvonne claimed to have forgotten many details of the jump rope incident and minimized the extent of her injuries.

2

DCS had legal custody and Mother could only visit Yvonne. Although Mother assured the case manager that she would not upset Yvonne by telling her she was going home, when she entered the visitation room, Mother told Yvonne: "Get your stuff. You're leaving with me." Mother maintained that she had "a piece of paper" that allowed her to take Yvonne and that DCS had kidnapped her.[2]

According to the case manager, Mother's behavior visibly upset Yvonne. The case manager's attempts to calm the situation were stymied when Mother began shouting to Yvonne that Father was evil and was going to kill her. The case manager ended the visit early, and when Mother refused to leave without Yvonne, a law enforcement officer attempted to escort her from the building. Mother resisted his attempts, overturning furniture and causing damage to the visitation room in the process. She also shouted for Yvonne to run away. Mother was arrested a second time for disorderly conduct.

After the second visit, Mother filed police reports against both the case manager and the arresting officer. She claimed that the case manager had sexually abused Yvonne during the October 29 visit and the arresting officer had assaulted her. Mother was subsequently charged with filing a false police report. From this point forward, Mother refused all of the case manager's calls and stopped participating in any child and family team meetings.

At DCS's request, Mother submitted to a psychological evaluation and a clinical parenting intervention assessment on January 6, 2016. Dr. Scott Herman, a senior psychological examiner, administered the testing. He was unable to provide a mental health diagnosis, however, because Mother "unrealistically denied symptoms and problems." The parenting assessment was similarly ineffective because Mother's responses indicated a pattern of "faking good," or unrealistically reporting that her parenting was problem-free.

Father confirmed that Yvonne called him on September 21 and told him Mother wanted to hurt her. He claimed that he heard Mother state: "I'm not afraid of you. I'm gonna fight you." He called the police because he feared his daughter would be hurt.

After he learned that Yvonne had been placed in foster care, he attended the preliminary hearing and asked that Yvonne be placed with him in Illinois. He was evaluated by the Illinois counterpart to DCS, and Yvonne was placed in his home beginning in November 2015, although DCS retained legal custody.

---

[2] In a phone conversation with Yvonne, Mother continued to insist that Yvonne had been kidnapped. She instructed Yvonne to repeatedly call 911, let them know she had been kidnapped, and seek their help.

Father testified that he was concerned about Mother's mental health. He claimed that Mother admitted to him that she had been diagnosed previously with bipolar disorder.

At some point, Mother was admitted for five days to Ten Broeck, a crisis stabilization unit. According to the case manager, Mother acknowledged that she was told to continue individual mental health counseling as well as to take prescribed medication. Mother, however, did not follow these recommendations.

For her part, Mother denied any mental health issues. According to Mother, she was released from Ten Broeck with no recommendations for further treatment. She testified that the medication recommendation was optional, and she stopped taking the medication because it made her feel anxious. Mother denied she had ever been diagnosed with bipolar disorder or suffered from paranoia. Mother further explained that she voluntarily submitted to another mental health evaluation at Mental Health Cooperative, which revealed no mental health issues. She had no records from that evaluation, however.

As Mother was testifying, the court announced it needed additional information on Mother's mental health status to render a decision.[3] Mother agreed to submit to another psychological evaluation administered by Dr. Herman, and the court continued the hearing pending the completion of the evaluation.

B.

When the hearing reconvened in September, DCS submitted the results of Mother's second mental health and parenting assessment and the deposition of Dr. Herman. Dr. Herman determined that Mother had an adjustment disorder with anxiety, a condition that is typically of short duration.[4] He explained that Mother exhibited a pattern of overreacting to stressful events. He recommended cognitive behavioral therapy designed to help her control the anxiety associated with stressful situations. Without intervention, she remained at risk of repeating the behavior she had exhibited during this case.

Dr. Herman found no indication that Mother was an abuser. But he noted that she again unrealistically reported parenting problems on the parenting stress index. Some of

---

[3] Before a 2016 amendment, Tennessee Code Annotated § 37-1-129(f) authorized the court to continue a dependency and neglect hearing "for a reasonable period to receive reports and other evidence bearing on the disposition or the need for treatment or rehabilitation." Tenn. Code Ann. § 37-1-129(f) (2014).

[4] Dr. Herman agreed that, if Mother's symptoms continued for more than six months, his diagnosis would change to trauma-related disorder or anxiety disorder.

4

Mother's responses raised "red flags" about her parenting, such as her description of the jump rope incident, her belief that Yvonne was out of control, and her inability to explain her discipline methods. He declined to make any recommendations about visitation or custody of Yvonne without further study or observation of their relationship. Finally, he noted that Mother continued to blame Yvonne for the jump rope incident and took no responsibility for her own actions.

Submission of Dr. Herman's deposition concluded DCS's proof. Mother then testified. She gave a rambling narrative defense reiterating that she had never done anything wrong. She accused the DCS case workers of verbally abusing and bullying her. She maintained that the police had attacked and injured her at the DCS offices. She repeated her claim that she only hit Yvonne "to defend myself and to calm her down and help her have a chance to think twice." Again, Mother denied any mental health issues.

## C.

The circuit court found by clear and convincing evidence that Yvonne was dependent and neglected "due to the mother's mental illness, her violence toward those in authority and lack of taking responsibility for her actions." The court ordered Yvonne to remain in the legal custody of DCS, although placed in Father's home. The court granted Mother supervised visitation with Yvonne for one weekend per month for five months. After that time, if Mother followed Dr. Herman's therapy recommendations and attended counseling with Yvonne, Mother would be allowed unsupervised visitation every other weekend and "a lengthy summer visitation."

## II.

Mother's sole argument is that the court's finding of dependency and neglect was not supported by clear and convincing evidence.[5] On appeal, we review the circuit court's findings of fact de novo, with a presumption of correctness unless the evidence preponderates otherwise. *In re Isaiah L.*, 340 S.W.3d 692, 706 (Tenn. Ct. App. 2010). When factual findings are based on credibility determinations, we "afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary." *Cornelius v. Tenn. Dep't Children's Servs.*, 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009). Then, we must determine whether the combined weight of the facts clearly and convincingly establishes that the child is dependent and neglected.

---

[5] Before 2016, Tennessee Code Annotated § 37-1-129(c) mandated that a court finding of dependency and neglect be supported by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c) (2014). A 2016 amendment removed the clear and convincing evidence requirement. 2016-1 Tenn. Code Ann. Adv. Legis. Serv. 110 (LexisNexis). The circuit court applied the pre-2016 version of the statute in finding that DCS had met its burden of establishing dependency and neglect. The parties do not raise this as an issue on appeal. Because we conclude that clear and convincing evidence supports the court's decision, we find it unnecessary to decide whether a lesser burden of proof applied.

*In re Isaiah L.*, 340 S.W.3d at 706.

A.

Tennessee courts have long recognized the right of a biological parent to the care and custody of her child. *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995) (quoting *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right, however, is not absolute and may be limited under certain circumstances. *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011). One of those circumstances is when a child is declared dependent and neglected. *Id.* "The primary purpose of dependency and neglect proceedings 'is to provide for the care and protection of children whose parents are unable or unwilling to care for them.'" *Id.* (quoting *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 n.11 (Tenn. Ct. App. Mar. 8, 2005)).

Juvenile courts have exclusive, original jurisdiction to hear dependency and neglect petitions. Tenn. Code Ann. § 37-1-103(a)(1) (2014). Ordinarily, dependency and neglect cases are tried in two phases: the adjudicatory phase and the dispositional phase. *Id.* § 37-1-129(c); *but see In re Caleb L.C.*, 362 S.W.3d 581, 595 (Tenn. Ct. App. 2011) (holding the statute permits the trial court to combine both phases into one hearing). First, the court must determine whether a child is dependent and neglected within the meaning of the statute. Tenn. Code Ann. §§ 37-1-129(b)(2), 37-1-102(b)(13) (Supp. 2016). Only if the court has determined a child to be dependent and neglected will the court proceed to the dispositional phase. *Id.* § 37-1-129(b)(2).

Because of the potential impact a dependency and neglect finding may have on the constitutionally protected parent-child relationship, a Tennessee statute has required clear and convincing evidence of all elements. *See In re Gaven R.*, No. M2005-01868-COA-R3-CV, 2007 WL 2198288, at *7 (Tenn. Ct. App. July 23, 2007) (discussing pre-2016 version of Tenn. Code Ann. § 37-1-129(c)). Clear and convincing evidence should produce a firm belief in the truth of the allegations and eliminate any real doubt about the correct conclusion to be drawn from the evidence. *In re Isaiah L.*, 340 S.W.3d at 705.

Appeals from a juvenile court's order in a dependency and neglect proceeding are made to the circuit court. The circuit court must hear witnesses and try the case de novo. Tenn. Code Ann. § 37-1-159(a) (Supp. 2016). "A de novo trial is '[a] new trial on the entire case-that is, on both questions of fact and issues of law-conducted as if there had been no trial in the first instance.'" *Cornelius*, 314 S.W.3d at 906 (quoting *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006)). "Consequently, the circuit court is not 'reviewing' the juvenile court's decision; instead, it is conducting a new proceeding as though the petition was originally filed in circuit court." *Id.*

6

The de novo hearing requirement directs the circuit court to determine whether the child is dependent and neglected as of the time of the new hearing. *See Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at \*9-10 (Tenn. Ct. App. Feb. 11, 2009). Thus, the court must make a fresh determination based on the evidence presented. *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006); *In re Isaiah L.*, 340 S.W.3d at 707.

B.

By statute, a child is dependent and neglected if the child's parent, "by reason of . . . mental incapacity, . . . is unfit to properly care for such child[.]" Tenn. Code Ann. § 37-1-102(b)(13)(B). Mother argues that DCS failed to establish by clear and convincing evidence that she lacks the mental capacity to care for Yvonne. According to Mother, the court based its decision on inadmissible hearsay from the Ten Broeck medical records. She insists that Dr. Herman's evaluation revealed that she is mentally stable and suffering from a temporary adjustment disorder, a condition that does not prevent her from properly caring for her child.

The Ten Broeck medical records were not admitted as evidence at the hearing, and we agree that it was error for the court to rely on them. *See In re Audrey S.*, 182 S.W.3d 838, 875 (Tenn. Ct. App. 2005) (noting that the Tennessee Rules of Evidence apply to adjudicatory hearings). But the court also based its finding of mental incapacity on the testimony of lay witnesses, Dr. Herman and Mother; the results of Mother's mental health assessment; and its own observations of Mother's behavior in court.

Even disregarding the Ten Broeck medical records, we conclude that the evidence clearly and convincingly established that, at the time of the hearing, Mother's mental condition rendered her unable to properly care for her child. Therefore, to the extent that the court relied on the medical records, the error was harmless. *See* Tenn. R. App. P. 36(b). Multiple witnesses described Mother's disruptive behavior during Yvonne's time in foster care. Although Mother denied much of that testimony, the court specifically found her not credible, and we find no basis in this record to disturb that finding on appeal. The court also relied on Mother's behavior in court when she repeatedly interrupted the judge, changed her testimony, and accused the other witnesses of lying.

Dr. Herman diagnosed Mother with an adjustment disorder with anxiety and recommended treatment. While Mother characterizes Dr. Herman's diagnosis as minor, we have affirmed termination of a parent's rights based on a similar diagnosis. *See Tenn. Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at \*10 (Tenn. Ct. App. Jan. 17, 2007) (affirming termination of a parent's rights based on a diagnosis of adjustment disorder with anxiety and depressed mood, as well as dependent personality disorder).

7

Dr. Herman agreed that, without treatment, Mother was at risk for continued overreaction to events she found stressful. He explained that, on the parenting stress index, Mother scored high on the "defensiveness scale," thus underreporting the stresses she faced in parenting Yvonne. He also identified what he termed as parenting "red flags," including her inability to explain her discipline methods, her description of Yvonne as "out of control," and her failure to take any responsibility for the jump rope incident. While Dr. Herman expected Mother's condition to improve, that expectation was predicated on Mother's participation in counseling and therapy.

## III.

For the foregoing reasons, we affirm the circuit court's decision and remand for further proceedings consistent with this opinion.

_____
W. NEAL McBRAYER, JUDGE