IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 11, 2014

# IN THE MATTER OF: KASON K. C.

**Appeal from the Circuit Court for Rutherford County**
**No. 65674     Robert E. Corlew, III, Judge**

---

## No. M2013-01607-COA-R3-JV - Filed May 7, 2014

---

This is a dependency and neglect case. The trial court found, by clear and convincing evidence, that the minor child was dependent and neglected under Tennessee Code Annotated Section 37-1-102(b)(23)(A)(i) due to Appellant/Father's knowing use of force upon the child, which force was likely to cause the child serious bodily injury. Father appeals this finding. We conclude that the evidence clearly and convincingly establishes that Father did knowingly "use . . . force on [the] child that [was] likely to cause serious bodily injury or death." Affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Mark J. Downton, Nashville, Tennessee, for the appellant, Glenn C.

Robert E. Cooper, Jr., Attorney General and Reporter; Alexander S. Rieger, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

## OPINION

The child in this case, K.K.C., was born in October 2010.[1] K.K.C. was first

---

[1] In sensitive cases, involving minor children, it is the policy of this Court to remove the names of the children and other parties in order to protect their identities.

determined to be dependent and neglected in the Juvenile Court of Rutherford County. The State of Tennessee Department of Children's Services ("DCS," or "Appellee") filed its petition in the juvenile court on or around November 30, 2011. The original dependency and neglect petition was filed against both Glenn C. ("Father," or "Appellant") and mother. Although dependency and neglect grounds were found against mother, she did not appeal the juvenile court's order and is, therefore, not a party to the instant appeal. Father, however, appealed the juvenile court decision to the Circuit Court of Rutherford County. It is well settled that a dependency and neglect appeal from the juvenile court to the circuit court is *de novo*, but the juvenile court record may be considered by the circuit court. Tenn. Code Ann. § 37-l-159(a) and (c). Here, the juvenile court record is not part of our appellate record. Furthermore, we are unable to discern from the appellate record whether the juvenile court record was either admitted in the trial court, or considered by the circuit court in reaching its finding of dependency and neglect. *See* Tenn. Code Ann. § 37-1-159(c) ("When an appeal has been perfected, the juvenile court shall cause the entire record in the case, including the juvenile court's findings and written reports from probation officers, professional court employees or professional consultants, to be taken forthwith to the criminal court or circuit court whose duty it is, either in term or in vacation, to set the case for an early hearing."); *see also* **In re Isaiah L.**, 340 S.W.3d 692, 707 (Tenn. Ct. App. 2010) ("On appeal, the record of the juvenile court **must** be provided to the circuit court.") (emphasis added). Father makes no argument on appeal regarding the lack of record from the juvenile court. Indeed, we are unable to determine from the record whether the juvenile record was provided to the circuit court and simply omitted from the record. Regardless, the circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court, but must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. *See* **In re Isaiah L.**, 340 S.W.3d at 707. Here, the trial court did conduct a *de novo* hearing in the case, which is in compliance with the foregoing authority regardless of whether the juvenile court record was considered. We note at the outset that, based upon his affidavit of indigency, by order of January 22, 2013, the trial court appointed an attorney to represent Father during these proceedings.

DCS was first contacted about the child following an incident that occurred on November 28, 2011, when the child was approximately thirteen months old. As discussed in more detail below, police were called to the Middle Tennessee Medical Center after the chief security officer, George Dyer, encountered Father attempting to get into a state-owned vehicle with the child. When Mr. Dyer approached Father to ascertain why he was attempting to enter a vehicle that was not his, Father became aggressive, and Officer Dyer called for police backup. When police arrived, Father became more aggressive, and began to grab the child around his head and neck in a manner that the officers, as discussed below, deemed was likely to cause severe harm or death to the child. Father was subdued with

-2-

force, arrested, and taken into custody. DCS was called to attend to the child. Father was ultimately convicted of charges related to this incident in the Criminal Court of Rutherford County, discussed *infra*. At the time of the hearing in the circuit court, Father was incarcerated.

The *de novo* appeal was heard by the circuit court on January 21, 2013. We will specifically discuss the evidence adduced at that hearing in the analysis section below. By order of June 14, 2013, the trial court found that K.K.C. was a dependent and neglected child. Specifically, the court found:

> [T]he Court finds, by clear and convincing evidence, finding in fact and by conclusions of law, that the Child, [K.K.C.], was abused/neglected by [Father], per T.C.A. 37-1-102(b)(12)(G). Furthermore the Court finds that said Abuse/Neglect, based upon the attached findings [the trial court's order specifically incorporates, by reference, its oral findings, which were made at the January 21, 2013 hearing], was knowing [here the trial court cites specific sections of its oral ruling, which we will discuss in more detail, *infra*] and was likely to cause serious bodily injury or death as defined under T.C.A. §37-1-102(b)(23)(A) defined as: "The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Therefore, the Court grants and finds, per the attached transcribed ruling, findings of fact and conclusions of law, that the Father. . . per T.C.A. §37-1-102(b)(23)(A), committed Severe abuse against the Child. . . .

Father appeals this order. He raises one issue for review as stated in his brief:

> Whether the [trial court] erred in [finding] that the child was dependent and neglected because Father knowingly engaged in severe child abuse as set forth at Tenn. Code Ann. §37-1-102(b)(23)(A).

Under Tennessee Code Annotated § 37-1-129, dependency and neglect must be established by clear and convincing evidence. Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. ***Tenn. Dep't of Children's Servs. v. Tikindra G. (In re Samaria S.)***, 347 S.W.3d 188, 200 (Tenn. Ct.

App. 2011). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re A.T.P.*, No. M2006-02697-COA-R3-CV, 2008 WL 115538, at \*4 (Tenn. Ct. App. Jan. 10, 2008) (citing *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at \*9 (Tenn. Ct. App. Aug. 13, 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.T.P.*, 2008 WL 115538, at \*4 (citing *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable' than not." *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). The appellate court applies the clear and convincing evidence standard as follows:

> Under this standard of proof, the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Cornelius* [*v. DCS*], 314 S.W.3d [902,] 906–07 [(Tenn. Ct. App. 2009)]. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. *Id*. Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that the parent committed severe child abuse is a question of law, subject to *de novo* review with no presumption of correctness. *Id*.

*In re Samaria S.*, 347 S.W.3d at 200.

A biological parent's right to the care and the custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *DCS v.*

***C.H.K.***, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn.2002); ***In re M.J.B.***, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004).

Our legislature has established the situations in which the rights of a biological parent may be limited. ***In re Samaria S.***, 347 S.W.3d at 201. These limitations include circumstances in which a child is deemed to be dependent and neglected. ***Id***. "Parents have a duty to provide, and children have a corresponding right to be provided with, a safe environment, free from abuse and neglect." ***In re H.L.F.***, 297 S.W.3d 223, 235 (Tenn. Ct. App. 2009); ***In re R.C.P.***, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004) (citations omitted). The primary purpose of dependency and neglect proceedings "is to provide for the care and protection of children whose parents are unable or unwilling to care for them." ***DCS v. M.S.***, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *9 n.11 (Tenn. Ct. App. Mar. 8, 2005).

As set out in its order, *supra*, the trial court found, by clear and convincing evidence, that K.K.C. was a dependent and neglected child under Tennessee Code Annotated Section 37-1-102(b)(23)(A). In pertinent part, Tennessee Code Annotated § 37-1-102(b)(23) defines "severe child abuse" as:

> (A) (i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).[2]

A finding of severe abuse has serious ramifications as it triggers other statutory provisions, including a prohibition on returning the child to the home of any person who engaged in or

---

[2] Tennessee Code Annotated Section 39-15-402(d) states:

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

knowingly permitted the abuse absent a finding that the child will be safe:

> No child who has been found to be a victim of severe child abuse shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse.

Tenn. Code Ann. § 37-1-130(d). Further, upon a finding of severe child abuse, DCS is not required to make reasonable efforts toward reunification. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A) (stating that under "aggravated circumstances," as defined in section 36-1-102, DCS is not required to make reasonable efforts toward reunification); Tenn. Code Ann. § 36-1-102(9) (including severe child abuse in the applicable definition of "aggravated circumstances"); *In re Tiffany B.*, 228 S.W.3d 148, 157 n.15 (Tenn. Ct. App. 2007) (citing the foregoing statutes in noting that the Tennessee General Assembly has recognized that "some parents' conduct is so inimical to their children's well-being that the family relationship either cannot or should not be repaired or restored"); *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 at *6 n.19 (Tenn. Ct. App. Mar. 9, 2004) (noting that severe child abuse is one of the aggravated circumstances in which DCS is not required to make reasonable efforts to reunite parents and children). The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. Tenn. Code Ann. § 37-1-113(g)(4) ("the parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court."). The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.[ *DCS v.*] *M.S.*, 2005 WL 549141, at *10. Thus, if there is a finding of severe child abuse, under the statutes, DCS is relieved of the obligation to use reasonable efforts to reunify the child with the parent, it is more difficult for the parent to regain custody, and one ground for termination of the parent's parental rights is effectively established. *In re Samaria S.*, 347 S.W.3d at 201.

Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of non-accidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and

convincingly show severe child abuse.

It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on pre-verbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury:

> The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute. . . . In the context of the dependency and neglect statutes, the term has been described as follows:
>
>> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.
>
> *In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5, 2010 Tenn. App. LEXIS 447 (Tenn. Ct. App. July 14, 2010) (citing *In re R.C.P.*, 2004 Tenn.App. LEXIS 449, 2004 WL 1567122, at *7); *see also In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009).

*In re Samaria S.*, 347 S.W.3d at 206. In the case of *In re Samaria S.*, the premature twin infants at issue were diagnosed with severe failure to thrive. The appellant mother had low intellectual functioning and argued that her failure to feed her premature infants correctly was not "knowing" because she did not have the intellectual ability to understand the hospital's feeding instructions or to grasp and appreciate the risk to her children. *Id*. at 205–06. The mother also testified that she, in fact, fed the children properly. *Id*. at 207. On appeal, this Court affirmed the trial court's factual finding that the mother's conduct was knowing. Even given the mother's low intellectual capacity, she acted in reckless disregard of the hospital's painstaking instructions on how to feed the premature twin infants, and her patently false claim that she in fact fed them properly indicated that she acted in a "state of awareness." *Id.* at 206–07. The appellate court held that the combined weight of the specific

facts showed clearly and convincingly that the infant twins were subjected to severe child abuse. *Id*. at 207.

With these standards in mind, we turn to analyze the evidence in the case at bar. At the January 21, 2013 hearing, DCS called George Dyer to testify. As noted above, Mr. Dyer was the security officer on duty at the time of the incident on November 28, 2011 at the Middle Tennessee Medical Center. Officer Dyer testified that he first made contact with Father after he received a radio call that Father was attempting to enter a state-owned vehicle with the child, who was wrapped in a blanket. When Officer Dyer attempted to ascertain why Father was trying to enter a vehicle that was not his, Father was recalcitrant and initially refused to speak. Officer Dyer testified that Father was acting "in a kind of aggressive manner . . . with his facial expressions and the grunting he was doing." While this was happening, another security officer, Timmie D. Clardy, arrived on the scene, and proceeded to "kind of watch [Officer Dyer's] back." When Officer Clardy arrived, Officer Dyer testified that Father "became very aggressive [and] started moving toward [Officer Clardy]." Officer Dyer told Father to stop, "because he was almost letting go of the kid, almost dropping the child, and balling his fist at the same time like he was going to strike [Officer Clardy]." "[B]ecause it was raining[, and] cold, and [he] didn't want the child to get sick," Officer Dyer was able to persuade Father to sit in the back of his vehicle. At this point, Officer Dyer called for backup from the Murfreesboro Police Department ("MPD").

Officer Dyer further testified concerning what he witnessed after the MPD officers arrived. The MPD officers confronted Father in the backseat of Officer Dyer's vehicle. Officer Dyer was outside the vehicle at this point, but when he heard yelling, he went to the passenger side of the vehicle and got in. At that point, Officer Dyer stated that Father "had the child across the chest and had his hand around the back of his neck grabbing the chin and was starting to pull in this manner (indicating), like he was going to break the child's neck." Officer Dyer told Father that "he had three seconds to let go of the child or [he] was going to strike [Father]." Father did not comply and Officer Dyer testified that he did strike Father. When he struck Father, "his grip [on the child] let loose a little bit, and the [MPD officer] . . . grabbed the child," while Officer Dyer and the other MPD officer on site "were engaged in holding [Father]." Officer Dyer indicated that Father continued to "resist[] in an aggressive manner," but that the officers ultimately subdued him by handcuffs, and took him into custody.

Officer Clardy, who arrived on the scene prior to the MPD, testified that when he arrived, he observed that "[t]he child seemed to be okay, but he had a bruise around his left eye. [Father] seemed very agitated and angry." When Officer Clardy attempted to speak with Father, he observed that Father "was very angry, agitated about something . . . [and] seemed like . . . he was spaced out." While Officer Clardy was attempting to ascertain information

from Father, Father "grabbed the child by the crown of his head and turned his head and then stated, 'See what this bitch done [sic] to my child?'" According to Officer Clardy, this took place before the MPD arrived. At this point, Officer Clardy stated that he and Officer Dyer "had to actually grab [Father] and say, 'Don't do the child like that . . . .' We had to actually, forcibly grab him." When they did, Father released his grip on the child's head, but "he still held onto him." Officer Clardy testified that, at this point, he and Officer Dyer "didn't want to go any farther" until the MPD arrived.

Officer Clardy further testified that, when MPD Officer Robert L. Edwards, III and his partner MPD Detective Ben Harrison arrived on scene, he observed Officer Edwards speaking to Father in the back of Officer Dyer's vehicle. He observed that Officer Edwards asked Father if he needed any help, and asked if they could take the child inside to get him warm. While Officer Edwards was speaking with Father, Officer Clardy observed that Father "still ha[d] the [child] in his grip, and he took the child by his head . . . and kind of . . . pulled his neck this way. (Indicating). And at that time, I think that was enough, so we just went in on him." Officer Clardy explained that "[a]fter I seen [sic] that and after Officer Edwards seen [sic] that, we definitely was [sic] concerned at that point."

Detective Ben Harrison testified that after he and Officer Edwards arrived on the scene, they attempted to talk with Father, and "felt like he was under the influence of something" because they "couldn't understand him." When the MPD officers asked direct questions, Father "would just kind of yell." At this time, Detective Harrison testified that Father "was holding the child very aggressively[, and] . . . not . . . like you would [hold] a small child." Detective Harrison specified that, "when we first got there, [Father] . . . was holding the child. He was twisting his neck around, and at one time, he held [the child] by the throat and the child had a black eye." While Officer Edwards continued to try to talk to Father, Detective Harrison testified that he "walked just a little bit away [i.e., approximately a car length distance]." Officer Edwards soon called for Detective Harrison to assist him because Father's behavior was "escalating." Along with the hospital security guards, Detective Harrison went back to the car, where Detective Harrison "pushed [Father] with my right hand and got the baby with my left hand." During this struggle, Detective Harrison testified that Father "grabbed the thumb on my right hand and actually bent it back until it touched my arm," allegedly causing tendon and ligament damage that resulted in Detective Harrison having to take three months of medical leave.

Officer Edwards was next to testify for the State. In relevant part, he stated that when he and Detective Harrison arrived on scene, he approached the vehicle and found Father sitting in the middle of the backseat. Officer Edwards described Father as "very agitated," and noted that he had a "firm grip" on the child. Officer Edwards proceeded to question Father, but found him "uncooperative." Officer Edwards also noticed "a bruise on the

-9-

baby's. . . lower left eye [and] cheek." Officer Edwards' engagement with Father then "got quite chaotic":

> And so at one point, you know, as [Father] was getting madder by the minute, he said, "Well, if it's going to be like that," that's when he grabbed the baby, and, of course, he put his left hand around the baby's neck and took his right hand and grabbed [the baby] right here (indicating) and tried to hurt the baby some.

At this point, Officer Edwards called for assistance from Detective Harrison, stating: "He[] [i.e., Father] is trying to break this baby's neck. We're going to have to get this baby away." Officer Edwards described these moments as follows:

> So I just turned and hollered [sic] at [Detective Harrison] real quick, but I turned back to [Father], and [thought] that if he tried to break this baby's neck one more time . . . I was going to shoot him.

Detective Harrison responded by going around to the other side of the vehicle, and Officer Clardy followed. The three officers then "started wrestling with [Father]. And I don't know how Officer Harrison got the baby away from him, but he did and we pulled [Father] . . . out of the driver's side back door and . . . wrestled him to the ground." Father was "resisting all the way."

Detective Tommy Roberts, with the MPD, testified that he works the "SVU unit, and . . . primarily do[es] child abuse cases." This case was assigned to Detective Roberts. He interviewed the officers who were on scene, and then made a report to the District Attorney General's Office. Detective Roberts testified that the grand jury indicted Father, and that he was ultimately convicted by a jury of "attempted voluntary manslaughter, attempted aggravated child abuse and neglect, child abuse [of a child] under eight, assault, [and] resisting arrest."

Father's mother, Joann D.W., testified that she has observed behavior that has led her to believe that Father has a drug problem, and that Father and the child's mother, who were living with her at the time, had gotten into an altercation the morning of the incident that led to the removal of the child. Father testified that he was irritated with the child's mother because she had let the child fall, which had resulted in his black eye. Father stated that he had walked to the hospital parking lot with his son, when it began to rain. He stated that he attempted to get into Officer Dyer's vehicle to get his the child out of the rain, when he was approached by the officer and asked what he was doing. When Father was questioned about

-10-

why he had twisted the child's neck, he stated that the officers had "misinterpreted" his action, and that he was simply "turning [the child's] face toward [the officers] [to] show them his eye," and that they had interpreted that action as "me trying to break his neck." Father further stated that the child:

> was sitting right beside me and I had my arm around him like this right here. (Indicating). Just like–as if I had my arm around his shoulder, like my little buddy. When I actually showed the [officers] his eye, he was up on my chest, crawling up on me like this. (Indicating). And him [sic] and I were face to face.

Based upon the foregoing evidence, the trial court made the following, relevant statements from the bench, following the January 21, 2013 hearing. As noted above, the trial court's oral statements are incorporated, by reference, into its June 14, 2013 order. The court first found that all of the witnesses were credible, but, noting the discrepancy between the officers' testimonies and Father's, the court ultimately held that the officers' testimonies were more credible than Father's because Father "stands to gain or lose [his] rights [to the child], . . .whereas the officers don't. The officers are more disinterested witnesses. . . . They were simply there at the scene because of their employment." It is well settled that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Here, the trial court's finding of severe child abuse was clearly based upon its credibility finding that the testimony of the officers was more valid than Father's testimony. Accordingly, where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Franklin County Bd. Of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn.2002)).

After stating its finding that the testimonies of the officers were more credible than Father's testimony, the trial court found that "the evidence presented by the State [i.e., the officers' testimonies] certainly preponderates and, in fact, by clear and convincing evidence shows . . . that the issue of child abuse was present at that time based upon the circumstances." The court cited Tennessee Code Annotated Section 37-1-102(b)(23)(A), and then began its analysis with the "knowing" requirement, which we discussed *supra*:

First of all, as to the issue of [Father's] knowing actions. Certainly, there is substantial argument initially that, in fact, [Father] may have been under the influence of drugs or intoxicants or in some manner unable then to have a knowing action or opportunity to conduct his activities on this particular day . . . in a knowing manner.

\*\*\*

It appears to us respectfully as we consider the proof that's been presented that the evidence does not preponderate in favor of a finding that [Father] was under the influence of drugs to the extent that it would have affected his ability knowingly to have taken actions.

\*\*\*

Based upon the evidence that we have before us, we can't find that there was sufficient level of drug involvement or other intoxicant involvement, which would, in fact, have cause[d] [Father] to not be acting in a knowing manner as he conducted the actions, which he conducted on this November . . . day.

Based upon our review of the entire record in this case, we cannot conclude that the evidence preponderates against the trial court's finding that Father was not under the influence to such a degree as to be unaware of his activities. Although Father's testimony certainly provides a different scenario of the events at issue, he nonetheless testified that he made knowing decisions on that day. Furthermore, the testimonies of the officers, although indicating that Father seemed "spaced out," and "unresponsive," support the trial court's conclusion that Father knew what he was doing. The trial court's individual findings concerning Father's knowledge are supported by the preponderance of the evidence. Furthermore, the weight of these findings, when viewed together, provide clear and convincing evidence that Father was acting with knowledge sufficient to satisfy the statutory requirement.

The trial court next addressed the substantive finding of severe child abuse under Tennessee Code Annotated Section 37-1-102(b)(23)(A), stating:

The remaining issue then is whether the use of force, which [Father] used, was, in fact, . . . likely to cause serious

-12-

bodily injury or death on this same occasion. Certainly, [Father's] testimony was that the force that he used was not undue at all. That the force he used was not aggressive; that the force he used was not inappropriate. We do have the testimony though, of the other officers who . . . testifie[d] for the State . . . .

Although the four witnesses from the State's proof who testified saw things from different perspectives, different time frames, because, of course, some arrived at different times, others were present right with [Father] during the time when the alleged use of force took place, and others were somewhat less able to observe those issues.

[T]he proof does . . . show and the Court does find based upon clear and convincing evidence that the rough manner, which all of the State's witnesses testified– the rough manner in which [Father] was manipulating or moving the child's head . . . . was such that. . . in the words of the statute– reasonably could be considered force, which, in fact, was likely to cause serious bodily injury. I think we must come to that conclusion.

The court noted that there was no proof to show that the child was, in fact, injured, but correctly stated that "[t]he statute does not require that we make such a finding." Rather, the "statute requires . . . that the evidence. . . show that a force was used in a knowing manner, which is likely to cause serious bodily injury. I think the evidence does establish that and does show by clear and convincing evidence that to be the case." After reviewing all of the evidence, which we have discussed above, and in light of the credibility findings of the trial court, to which we defer, we conclude that the evidence, when taken together, clearly and convincingly supports the trial court's finding that Father knowingly engaged in actions likely to cause serious bodily injury to this child. We find persuasive the fact that all four officers' individual accounts of the events of November 28, as set out above, corroborate each other. There is very little discrepancy among the officers' respective recollections of that day. Furthermore, the testimony of Officer Edwards that he stood ready to shoot Father based on Father's erratic and dangerous behavior indicates the severity of Father's actions against this child. The trial court specifically found that all the officers were credible witnesses, including Officer Edwards. Accordingly, the trial court impliedly found that Officer Edwards' perception of the severity of the events was reasonable. Although the other officers were not inside the car during all of the alleged abuse against the child, their corroborating statements concerning Father's general demeanor and actions provide further proof that he was acting in an objectively abusive manner toward this child. From the totality of the evidence, we conclude that the statutory ground of severe child abuse, as set out in

-13-

Tennessee Code Annotated Section 37-1-102(b)(23)(A) is satisfied by clear and convincing evidence in this case, and that the trial court did not err in concluding that the child was dependent and neglected pursuant to this statute.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against the Father, Glenn C. Because Father is proceeding, *in forma pauperis*, in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE