IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 20, 2015

**IN RE MARCELL W.**

**Appeal from the Circuit Court for Shelby County**
**No. CT00521313     Robert Samual Weiss, Judge**

_____

**No. W2014-02120-COA-R3-CV – Filed July 16, 2015**
_____

This appeal results from a dependency and neglect action initiated in the Shelby County Juvenile Court. The juvenile court found that the child was dependent and neglected. The juvenile court also found that the child's severe injuries constituted severe child abuse perpetrated by the child's mother. On appeal, the circuit court affirmed. Discerning no error, we also affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., joined in part, and BRANDON O. GIBSON, J., joined in part; ARNOLD B. GOLDIN, J., filed a concurring opinion in which BRANDON O. GIBSON, J., joined.

Reginald E. Shelton, Memphis, Tennessee, for the appellant, Michelle W.

Herbert H. Slatery, III, Attorney General and Reporter; Ryan L. McGehee, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**Background**

On September 3, 2012, the child at issue, Marcell W.[1] ("the child" or "Marcell"),

---

[1] In cases involving dependency and neglect, it is this Court's policy to initialize the last names of the parties to protect the identities of the children involved.

presented at LeBonheur Children's Hospital ("LeBonheur"). The child's mother, Michelle W. ("Mother") informed LeBonheur's staff that the child was not acting normally. Upon examination, doctors discovered that, among other issues, the child was bleeding in his brain and a liver laceration. The child was approximately five months old at the time. No explanation was given by Mother as to the cause of these injuries. Accordingly, on September 4, 2012, LeBonheur made a referral to the Tennessee Department of Children's Services ("DCS") regarding the child. The referral indicated that the perpetrator was unknown.

## Juvenile Court Proceedings

On September 14, 2012, while the child remained at LeBonheur, DCS filed a petition in the Shelby County Juvenile Court to adjudicate the child dependent and neglected and the victim of severe abuse. The petition alleged that the child presented to LeBonheur with a right subdural hematoma,[2] elevated liver function, a right-lobe liver laceration, a buckle fracture on the left wrist, and bilateral retinal hemorrhages.[3] According to the petition, the only explanation Mother gave for the injuries to the child was that the child may have hit his head while sleeping next to a wall. The petition further alleged that after a Child and Family Team meeting was held with Mother, the team agreed that returning the child to the home was not in the child's best interests. Although a relative placement was explored, no relative placement was subsequently approved. Accordingly, DCS recommended that temporary custody of the child be awarded to DCS. The child was ultimately placed in a foster home. Finally, because of the severe injuries to the child, DCS asked that the juvenile court find that Mother committed severe abuse of the child.

On September 14, 2012,[4] Magistrate Herbert J. Lane, acting as Special Judge, signed a protective custody order temporarily vesting custody of the child with DCS. The order further directed that a guardian ad litem would be appointed for the child, "consider[ed] the need to

---

[2] A subdural hematoma is defined as "an accumulation of blood in the subdural space, usually caused by an injury." *Mosby's Medical, Nursing, and Allied Health Dictionary* 1557 (5th ed. 1998). The subdural space refers to an area around the brain. *See id.* at 120, 522, 1557.

[3] A retinal hemorrhage is the "loss of a large amount of blood in a short period" of the eye. *Mosby's Medical, Nursing, and Allied Health Dictionary* at 749, 1413.

[4] The dates contained in the record for many of the proceedings are unclear. While many orders appear to have been signed by the magistrate or judge promptly after hearings, many orders were not entered until weeks or months later. For example, although the protective custody order was signed on September 14, 2012, it was not stamp-filed until July 31, 2013. This practice causes needless confusion.

appoint counsel" for the child's parents,[5] and set a preliminary hearing for September 29, 2012. Juvenile Judge Curtis Person ("juvenile judge") subsequently appointed counsel for Mother and a guardian ad litem for the child.

On October 25, 2012, an order was entered containing the findings and recommendations of Magistrate David S. Walker with regard to the preliminary hearing. Specifically, Magistrate Walker ruled that the protective custody order should remain in effect pending a final hearing, that because of the child's injuries, it was not reasonable to make efforts to maintain the child in the home, and that no less drastic alternative existed to placing the child in DCS custody. Accordingly, Magistrate Walker ruled that the child should remain in DCS custody pending a final hearing. The juvenile judge subsequently adopted the findings and recommendations of Magistrate Walker.

On January 30, 2013, Juvenile Magistrate Felicia M. Hogan entered an order continuing the current placement of the child and ratifying a permanency plan for the child. The permanency plan included the goals of return to parent and/or adoption. The order further stated that Mother was fully compliant with the existing permanency plan. The juvenile judge subsequently adopted the findings and recommendations of Magistrate Hogan.

The dependency and neglect action was heard on April 2, 2013, by Magistrate Hogan.[6] Magistrate Hogan entered an order containing findings and recommendations on April 25, 2013. Specifically, Magistrate Hogan ruled that the petition to adjudicate the child dependent and neglected should be sustained due to clear and convincing evidence that the child was a victim of severe abuse committed by Mother. The magistrate's findings were adopted, ratified, and confirmed by the juvenile court judge. On April 9, 2013, Mother filed a request for a rehearing before the juvenile judge. On the same day, the juvenile judge entered an order permitting a rehearing.

A rehearing was scheduled to occur on July 8, 2013. On July 31, 2013, an order was entered by Magistrate Dan H. Michael, which indicated that he had been appointed as Special Judge to preside over the rehearing because the judge found it necessary to be absent from holding court pursuant to Tennessee Code Annotated Section 17-2-122(b).[7] Special Judge

---

[5] Although the proceedings in the juvenile court also concerned the child's father, he has not participated in any proceedings concerning the child. Accordingly, we only consider the facts as they relate to Mother in this case.

[6] No transcript or statement of the evidence is included in the record on appeal from this hearing.

[7] Tennessee Code Annotated Section 17-2-122(b) provides:

Sections 16-15-209 [concerning the duty to interchange] and 17-2-109 [concerning the supreme court's ability to assign a retired judge to quell

Michael continued the hearing to September 23, 2013 at Mother's request. On September 18, 2013, Mother filed a motion for pre-trial discovery. On the same day, Mother filed a motion in limine to exclude: (1) all evidence that was not submitted to her in discovery; (2) all testimony regarding matters not alleged in the petition; and (3) to limit the testimony of DCS's expert to only "the nature and extent of the injuries suffered" by the child, specifically excluding any testimony regarding causation or culpability. On September 20, 2013, Magistrate Hogan ratified another permanency plan for the child. This plan contained the goals of permanent guardianship and/or adoption.

Ultimately, the rehearing of the dependency and neglect finding occurred on September 23, 2013.[8] Present at the hearing were Mother, the child's guardian ad litem, representatives from DCS, and Deborah V. ("Foster Mother"), the child's foster parent. Again, Special Judge Michael presided over the cause, as the juvenile judge found it necessary to be absent from holding court.[9] In its November 27, 2013 ruling, the Special Judge confirmed the magistrate's ruling that clear and convincing evidence existed to support a finding of both dependency and neglect and severe abuse. The Special Judge also changed the permanency plan to reflect a goal of adoption only. Accordingly, the Special Judge ordered that the child be placed in the legal custody of Foster Mother. Mother filed a timely notice of appeal to the Shelby County Circuit Court ("the circuit court" or "the trial court").

### Proceedings in the Circuit Court

After the appeal of the matter to circuit court, on January 31, 2014, DCS filed an emergency petition to correct the Special Judge's order. Specifically, DCS alleged that although the Special Judge's order directed that legal custody of the child be placed with

---

congestion or delay in the disposition of litigation] and any other relevant provision shall not apply where a judge finds it necessary to be absent from holding court and appoints as a substitute judge an officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile magistrate, a child support magistrate or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. The judicial officer shall only serve as special judge in matters related to their duties as judicial officer.

The record contains no order entered by the juvenile judge specifically appointing Magistrate Michael as special judge.

[8] Only a portion of the transcript of this hearing is contained the record, which portion contains Special Judge Michael's oral ruling.

[9] Again, the record contains no order entered by the juvenile judge specifically appointing Magistrate Michael as special judge.

Foster Mother, the Special Judge ruled from the bench that the child would remain in the custody of DCS pending adoption proceedings. DCS argued that removing the child from DCS custody had significant ramifications, as the foster parents would no longer be eligible to receive financial support to meet the child's medical needs. Accordingly, DCS requested that the matter be remanded back to the juvenile court for correction of the order.

On January 31, 2014, a consent order was entered allowing this cause to be remanded back to the juvenile court to correct the error in the November 27, 2013 order. On March 26, 2014, an order of correction was entered in juvenile court returning legal custody of the child to DCS.

On March 28, 2014, David R. and LaChundia R. (together, "Intervening Relatives") filed a motion to intervene in the proceedings and to stay the magistrate's ruling with regard to the changed permanency plan goal. Specifically, Intervening Relatives alleged that they were maternal cousins of the child who had been cooperating with DCS to serve as a relative placement for the child. According to Intervening Relatives, they had recently completed classes to be recognized as foster parents by DCS and had been attending meetings and doctor's appointments on behalf of the minor child. Intervening Relatives were allegedly approved as a resource parent home on September 25, 2013. Intervening Relatives argued that they were being unlawfully denied the opportunity promised them by DCS to parent the child. In their motion, Intervening Relatives stated that a Child and Family Team meeting took place on August 27, 2013, wherein the team agreed to place the child with Intervening Relatives pending their approval as a foster home. According to Intervening Relatives, the Special Judge at the rehearing on September 23, 2013 impermissibly changed the goal contained in the permanency plan to adoption without prior notice to the parties and in violation of Tennessee Code Annotated Section 37-2-403. Attached to their motion was a copy of a drafted permanency plan that indicated that placing the child with Intervening Relatives was the goal.

On April 4, 2014, Mark V. and Foster Mother (together, "Foster Parents") filed a motion to intervene. Foster Parents alleged that they were the current foster parents to the child and that the child had been placed with them since September 2012, a period of over eighteen months. Foster Parents filed their motion to intervene in order to respond in opposition to Intervening Relatives' motion concerning the alteration of the goal in the child's permanency plan. According to Foster Parents, they wished to adopt the child and had been recently informed that DCS would support their request.

On June 6, 2014, the child's guardian ad litem filed a response to Intervening Relatives' motion. The child's guardian ad litem generally supported Intervening Relatives' requests and argued that DCS was required to place the child with relatives. Further, the

guardian ad litem argued that DCS failed to make reasonable efforts to reunify the child and Mother.

DCS likewise filed a response to Intervening Relatives' motion on June 23, 2014. DCS did not dispute that Intervening Relatives had involvement with the child and his plan of care or that they undertook to become foster parents for the child. However, DCS argued that it had no duty to ensure a relative placement for the child after the child had already been in foster care for nine months at the time Intervening Relatives came forward to care for the child. Further, DCS denied that the change in the permanency plan violated Tennessee Code Annotated Section 37-2-403. DCS also argued that the permanency plan attached to Intervening Relatives' motion was not binding, as it had never been ratified by the juvenile court. Finally, DCS argued that because Intervening Relatives were not parties to the juvenile court proceedings, "it is too late for Intervening Relatives to intervene . . . at this stage in the proceedings."

Also on June 23, 2014, DCS filed a response to the Foster Parents' motion to intervene, generally agreeing that Foster Parents should be allowed to intervene as pre-adoptive parents. On June 26, 2014, Mother filed a response to Intervening Relatives' motion to intervene, generally agreeing with the allegations contained in Intervening Relatives' motion. Specifically, Mother alleged that she had no notice that the permanency plan goal would be changed at the September 23, 2013, hearing. Accordingly, Mother asked that the circuit court stay the order of the juvenile court and restore the goal of relative placement to the child's permanency plan. Finally, on June 27, 2014, Mother filed a response in opposition to the Foster Parents' motion to intervene.

The circuit court granted the Intervening Relatives' motion to intervene on August 11, 2014. Foster Parents were also permitted to intervene by order of August 14, 2014. On August 13, 2014, Intervening Relatives filed an amended motion for stay of the magistrate's ruling regarding the permanency plan. In addition to their prior arguments, Intervening Relatives also argued that the Special Judge presiding over the rehearing lacked subject matter jurisdiction over the claim because he was not properly appointed to preside over the case.

The circuit court conducted a *de novo* hearing on DCS's petition to adjudicate the child dependent and neglected and a victim of severe abuse on August 14, 2014. At trial, Tanisha Harper, an investigator for DCS, testified regarding how the child first came into DCS custody. According to Ms. Harper, on Tuesday, September 4, 2012, DCS received a referral that the child was the victim of severe physical abuse and that the child was currently admitted to LeBonheur. Ms. Harper was assigned to investigate the allegations. Accordingly, she arrived at LeBonheur and spoke with the child's maternal grandmother, who was staying

6

with the child. Mother was not present at the hospital at that time, but instead had returned to her home with crime scene police officers.

According to Ms. Harper, upon arriving at LeBonheur, she learned that the child had severe physical injuries, including a subdural hematoma, bilateral retinal hemorrhages, and a liver laceration.  Ms. Harper took photographs of the child, which were admitted into evidence over Mother's objection. Ms. Harper then interviewed the maternal grandmother,[10] who informed her that the child, Mother, and maternal grandmother attended a well-being check up with his pediatrician on the Friday before his injuries were discovered. According to maternal grandmother, no issues were observed by the pediatrician.  Thereafter, maternal grandmother informed Ms. Harper that Mother and the child stayed with maternal grandmother from Friday night until Sunday evening. Ms. Harper testified, however, that Mother later informed her that she and the child only stayed with maternal grandmother until Saturday evening. According to Ms. Harper, regardless of whether the child left on Saturday or Sunday, there was no evidence regarding any traumatic event that occurred while at maternal grandmother's home that could explain the child's injuries. Instead, maternal grandmother testified that the child was healthy and normal when he left her home. Maternal grandmother explained that she had no other contact with the child until she was called to come to LeBonheur.

Ms. Harper spoke in depth with Mother about the child's injuries at a Child and Family Team meeting on September 6, 2012. Mother confirmed that the child was healthy on the Friday before the incident. However, Mother was generally unable to explain the child's injuries. First, Mother offered that other children lived in maternal grandmother's home, one of whom liked to hold the child. However, Mother stated that the older child was never alone with Marcell and that she never witnessed the child fall or suffer injuries while at maternal grandmother's home.

According to Ms. Harper, Mother explained that upon leaving maternal grandmother's home, she returned to her own residence. In addition to Mother and the child, two others resided in the residence— Mother's paramour, Anthony G. ("Boyfriend") and his father. Mother stated that Boyfriend's father was not around the child at any time. In addition, Ms. Harper testified that Mother repeatedly emphasized that she is the primary caretaker of the child and that Boyfriend "did not have any contact or . . . care for the baby." In addition, Ms. Harper testified that Mother stated that Boyfriend was at work during the weekend at issue. However, Ms. Harper also testified that Mother later informed her that there was a time in which Boyfriend was alone with the child while she was taking a shower. According to Ms. Harper, however, this incident may have occurred on a different weekend. Indeed, Ms.

---

[10] Maternal grandmother did not testify.

Harper testified that she asked Mother several times if Boyfriend had contact with the child on the weekend in question and "she specifically said no."

Ms. Harper also tried to discern when the child's injuries occurred. According to Ms. Harper, Mother explained that periodically on Sunday, the child would "stiffen up" in an unexplained fashion. However, Mother stated that later in the day, the child appeared to be fine and that he continued to eat and sleep normally. Mother further stated that the child ate and slept normally on Monday morning. On Monday around 12:00 p.m., however, Mother noticed that the child was having hiccups and that he suddenly became non-responsive. On the advice of maternal grandmother, Mother decided to take the child to the hospital. Ms. Harper testified that after the child's extensive injuries were discovered, he remained in the hospital for nearly a month.

Ms. Harper admitted that the information contained in her testimony came solely from her conversations with Mother and maternal grandmother and information she received from LeBonheur. Ms. Harper did not interview Boyfriend or his father, nor did she investigate Mother's home, leaving that task to police officers. However, no police officers testified at trial.

The deposition of Dr. Karen Lakin, Assistant Professor of Pediatrics for the University of Tennessee, Medical Director for LeBonheur Child Assessment Program and general pediatrician, was read into the record. Dr. Lakin testified that her specialty is diagnosing and treating children with complex medical problems or non-accidental trauma. Dr. Lakin testified that when the child was admitted to LeBonheur, he was in critical condition.

Dr. Lakin testified as to Mother's explanation of the events leading up to the child's hospitalization. According to Dr. Lakin, Mother explained that on the day the child was admitted to the hospital, he woke up with what she thought was a fever but that he was otherwise playful and normal. Mother also stated that the child ate and slept normally on Monday morning. By noon, however, Mother told Dr. Lakin that she noticed the child "jumping." Dr. Lakin testified that Mother's description of the child's movement was consistent with seizure activity. Mother also told Dr. Lakin that the child was not responsive.

Upon presenting to LeBonheur, a CT scan revealed that the child suffered from an acute right subdural hematoma. Elevated liver enzyme readings also led to the discovery of the child's liver laceration. The child was then admitted to the hospital and a skeletal survey was performed, which revealed a left distal radial buckle fracture, meaning a fracture of the larger of the two bones in the arm, near the wrist. Dr. Lakin explained that this type of fracture is often seen when an individual falls and attempts to catch himself, but that was not possible in a child of five months old. Further, an ophthalmological exam revealed that the child suffered from bilateral retinal hemorrhages.

8

The child had previously presented to LeBonheur after a fall onto a concrete floor when he was approximately five weeks old; however, the child was found to have no injuries as a result of the fall at that time.[11] Dr. Lakin testified that the child's current injuries were not the result of his previous fall. Based upon all of the child's injuries, Dr. Lakin concluded that the child was a victim of non-accidental traumatic injury. Specifically, Dr. Lakin testified that the child's subdural hematoma and bilateral retinal hemorrhages were likely the result of "significant acceleration-deceleration type mechanisms which would be very abrupt acceleration and then sudden deceleration, which we often see in such as whiplash or shaking." In addition, Dr. Lakin stated that the child's liver laceration was "most definitely a traumatic injury to the liver because that required some type of impact that cause[d] that . . . break." Dr. Lakin also explained that the child's seizures could have been caused by the subdural hematoma. Dr. Lakin stated that the subdural hematoma and liver laceration were life-threatening injuries.

According to Dr. Lakin, Mother offered no plausible explanation for the child's injuries. Dr. Lakin specifically testified that a child of Marcell's age could not cause these injuries to himself by bumping his head against a wall, as Mother proffered. Dr. Lakin also explained that the child had no pre-existing conditions that could have made him more prone to these injuries and that a seizure could not have caused these injuries. Further, Dr. Lakin testified that had the child been injured on Friday, the child's pediatrician would have discovered his injuries. Dr. Lakin explained that during her interview of Mother, Mother indicated that only she was with the child on Monday, September 3, 2012, and that nothing out of the ordinary happened. Dr. Lakin admitted, however, that she had no knowledge of who was around the child prior to the morning of Monday, September 3. Regardless, Dr. Lakin testified that in her professional opinion, the child's injuries most likely occurred on Monday between the last feeding and around noon when the child became symptomatic because the child was sleeping and eating normally prior to that time. Dr. Lakin explained that due to the extent of the child's injuries, the child was not "going to be happy and eat, take a bottle and be playful during that period of time." Because Mother offered no plausible explanation for the injuries, such as a fall or car accident, Dr. Lakin testified that this led her to conclude that the child was the victim of "abusive head trauma." Finally, Dr. Lakin testified that due to his injuries, there is a "high likelihood" that the child will have developmental deficits. Specifically, Dr. Lakin testified that a child with these types of injuries are at higher risk of intellectual problems, developmental problems, and motor problems if the child develops cerebral palsy "secondary to the injury in his brain."

---

[11] Dr. Lakin testified that because Mother provided a suitable explanation related to the fall and the child had no real injuries, there was no suspicion that the child was the victim of non-accidental trauma as a result of that incident.

9

Foster Mother also testified regarding the child's injuries. At the time of trial, the child was twenty-seven months old. According to Foster Mother, the child suffers from severe developmental delays and difficulties. Foster Mother testified that at the time he came into the home, the child acted more like an infant than a six-month-old and that he had a cast on his arm. Through various therapies, the child has improved. However, he still functions at a ten-to-sixteen-month age level, he cannot walk,[12] he cannot use utensils to feed himself, and he cannot talk other than a few spontaneous words. The child attends approximately two doctor's appointments a month, and three or four therapy sessions a week. The child must attend physical therapy to address his gross motor skills and walking, speech therapy to help his severely delayed speech, and developmental therapy. The child is also required to take medication for spastic hemiplegia, which is a neurological disorder that causes one side of his body to become contracted. The child has undergone at least one surgery and may need additional surgeries to treat the spastic hemiplegia. Foster Mother testified that the child was recently diagnosed with cerebral palsy.[13] Foster Mother finally testified that she and her husband would like to adopt the child, should he become available for adoption.

Mother did not testify but instead invoked her right against self-incrimination due to criminal charges that were unresolved at the time of trial.[14] At the conclusion of trial, counsel for Intervening Relatives indicated that his clients wished to voluntarily dismiss their petition to intervene and to stay the magistrate's ruling. Subsequently, on August 22, 2014, an order

[12] Foster Mother testified that the child requires "braces and a walker and twister cables and all sorts of different equipment to try to align his legs properly."

[13] Cerebral palsy is defined as "a motor function disorder caused by a permanent, nonprogressive brain defect or lesion present at birth or shortly thereafter." *Mosby's Medical, Nursing, and Allied Health Dictionary* at 300.

[14] In her brief, Mother asserts that all criminal charges against her have been dismissed and that Boyfriend has been charged in an unrelated matter with child abuse of his own child. Accordingly, Mother asks this Court to consider this evidence, and remand for a rehearing so that Mother may testify and present additional evidence regarding the criminal charges. Rule 14 of the Tennessee Rules of Appellate Procedure governs requests to consider post-judgment facts. Rule 14(b) provides that a motion to consider post-judgment facts must be made pursuant to Rule 22 of the Tennessee Rules of Appellate Procedure. Rule 22 requires a written motion to this Court, a written memorandum of law, and an affidavit supporting such motion, if needed. Mother's counsel did file an affidavit with this Court; however, no motion was ever filed. Instead, Mother merely appended the relevant documents to her appellate brief. Generally, however, this Court will not consider documents that were merely attached to appellate briefs. *See* Tenn. R. App. P. 24; *Carney v. State*, No. M2006-01740-CCA-R3-CO, 2007 WL 3038011, at *4 (Tenn. Crim. App. Oct.17, 2007) (stating that "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal" (internal citation omitted)); *Forrest v. Rees*, No. 01C01-9411-CC-00387, 1996 WL 571765, at *3 (Tenn. Crim. App. Oct. 8, 1996) (stating that "attachments to briefs are not evidence and will not be considered by the appellate courts); *Pinney v. Tarpley*, 686 S.W.2d 574, 579 (Tenn. Ct. App. 1984) (stating that "[m]erely attaching a document to a pleading does not place that document in evidence").

of voluntary non-suit of Intervening Relatives' amended motion to intervene and to stay the magistrate's ruling regarding the permanency plan was entered by the trial court.

The trial court entered an order containing detailed findings of fact and conclusions of law on September 29, 2014. Therein, the trial court first disposed of Mother's pending motion in limine and motion regarding discovery. Although it had been non-suited, the trial court also denied Intervening Relatives' amended motion to intervene and to stay the magistrate's ruling. The trial court also found that the child was dependent and neglected and that Mother had committed severe abuse pursuant to Tennessee Code Annotated Section 37-1-102(b).[15] Mother filed a timely notice of appeal.

## Issues Presented

As we perceive it, Mother raises two issues on appeal:

1. Whether "it was error for the trial judge to deny a Motion to Stay the Magistrate's Ruling Modifying the Parenting Plan, or in the alternative, To Set Aside the Rulings of the Special Judge for Lack of Jurisdiction."
2. Whether the trial court erred in finding clear and convincing evidence that Mother committed severe abuse?

## Discussion

### The Intervening Relatives' Motion to Stay the Magistrate's Ruling

Mother first argues that the trial court erred in denying the Intervening Relatives' motion to stay the magistrate's ruling regarding the modification of the permanency plan or for lack of subject matter jurisdiction. Specifically, Mother argues that "because the record does not state the necessity for the judge's absence, . . . the magistrate sitting as special judge was not appointed by necessity but by convenience and was therefore not properly presiding." Further, Mother argues that the Special Judge erred in changing the goal of the permanency plan because "the relatives who had been working with the department and had become an approved foster home, should have been acknowledged as parties for the purposes of the permanency planning hearing." Both of these errors, Mother contends, require this

---

[15] The trial court and the parties both refer to the definition of severe abuse as being contained in Tennessee Code Annotated Section 37-1-102(b)(23), which refers to a prior version of the statute. However, in 2011, the General Assembly amended Tennessee Code Annotated Section 37-1-102 to delete certain subdivisions and renumber the remaining subdivisions. *See* 2011 Tenn. Laws Pub. Ch. 486 (H.B. 713) (taking effect on July 1, 2011). The change has no substantive effect on the outcome of this case. Accordingly, we will refer to the current version of Tennessee Code Annotated Section 37-1-102 throughout this Opinion.

Court to vacate the judgment of both the circuit court and Juvenile Court and remand for a new hearing before the juvenile judge.

As an initial matter, several procedural problems exist with regard to Mother's argument. First, we note that Mother is appealing the purported denial of a motion filed by another party. However, Mother has no standing to appeal the denial of another party's motion. *See **Knierim v. Leatherwood***, 542 S.W.2d 806, 808 (Tenn. 1976); ***Garrison v. Stamps***, 109 S.W.3d 374, 377 (Tenn. Ct. App. 2003) ("The doctrine of standing is used to determine whether a particular plaintiff is entitled to judicial relief."); ***SunTrust Bank v. Johnson***, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000) ("[Standing] requires the court to determine whether the plaintiff has alleged a sufficiently personal stake in the outcome of the litigation to warrant a judicial intervention."). Had Mother filed her own motion on the same grounds, she would certainly have standing to appeal a denial of her motion. However, a careful review of the record reveals that while Mother filed a response to the Intervening Relatives' motion generally agreeing with the allegations and arguments, Mother did not file her own motion to stay the proceedings, nor did she specifically join in the Intervening Relatives' motion. Moreover, although the Intervening Relatives filed an amended motion, Mother filed no response of any kind to this motion. Accordingly, she has no standing to raise the purported denial of that motion on appeal.

Furthermore, we disagree with Mother's characterization of the disposition of the Intervening Relatives' motion. Here, Intervening Relatives filed their first motion to intervene and stay the proceedings on March 28, 2014, in the circuit court.[16] This motion did not argue that the Special Judge presiding over the rehearing was not properly appointed and therefore, the juvenile court lacked subject matter jurisdiction. Instead, the argument was raised for the first time in Intervening Relatives' amended motion to intervene, to stay the magistrate's ruling, and to set aside the Special Judge's ruling for lack of subject matter jurisdiction filed on August 13, 2014. Because this was an amended motion, rather than simply an amendment to the original motion, "it supersedes and destroys the original [motion.]" ***H.G. Hill Realty Co. v. Re/Max Carriage House, Inc.***, 428 S.W.3d 23, 35 (Tenn. Ct. App. 2013) (quoting ***McBurney v. Aldrich***, 816 S.W.2d 30 (Tenn. Ct. App. 1991)). Accordingly, the amended motion became the only motion pending concerning this subject matter. This motion, however, was not denied by the trial court; it was voluntarily dismissed by Intervening Relatives. Indeed, in their notice and order of voluntary dismissal, Intervening Relatives specifically reference their argument concerning the Special Judge's subject matter jurisdiction, an argument raised only in the amended motion. Consequently, despite the trial court's final order, this motion was simply not denied, it was non-suited by Intervening

---

[16] Notably, as discussed *infra*, nothing in the record shows that this issue was raised in the juvenile court by any party.

Relatives. Accordingly, Mother's issue presented that the trial court erred in denying the Intervening Relatives' motion is without merit.

Regardless of how Mother frames her issue in the" issues presented" section of her brief, Mother goes on in the body of her brief to argue: (1) that the Special Master erred in altering the goal of the permanency plan at the rehearing of the dependency and neglect adjudication; and (2) that the Special Judge was improperly appointed so as to deprive him of subject matter jurisdiction to preside over the rehearing. Still more procedural problems plague Mother's argument, however. First, we note that Mother's first argument appears to concern her allegation that the Special Judge's ruling "cast aside family members who were not allowed to participate or even attend the rehearing." From our review of the record, however, Intervening Relatives filed no motion to intervene in the juvenile court. Moreover, Intervening Relatives were allowed to fully participate in the *de novo* appeal to the circuit court. Finally, and most importantly, Intervening Relatives subsequently voluntarily dismissed their case. Because they no longer have any interest in the outcome of this dispute, even if the juvenile court erred in not allowing Intervening Relatives to participate in the formulation of a permanency plan, any error is harmless. *See Childs v. Roane Cnty. Bd. of Educ.*, 929 S.W.2d 364, 367 (Tenn. Ct. App. 1996) ("[A] statutory error may be harmless if it does not prejudice the substantive rights of a party.") (citing *Tamplin v. Star Lumber & Supply Co.*, 836 P.2d 1102 (Kan. 1992)).

Most importantly, a thorough review of the record reveals that Mother never raised these issues in the juvenile court. It is well-settled that "parties will not be permitted to raise issues on appeal that they did not first raise in the trial court." *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009). Here, the record shows that the issues asserted by Mother were simply not raised by any party until the appeal of the dependency and neglect finding in the circuit court. Furthermore, although Intervening Relatives did raise these issues in the circuit court in their amended motion, Mother did not join in Intervening Relatives' amended motion or in any way express her approval of the position advanced by the amended motion in the trial court. As such, this appeal is the first time that Mother has raised these arguments. Accordingly, they are waived.

With regard to Mother's argument regarding the subject matter jurisdiction of the Special Judge, we note that Mother is correct in her assertion that arguments regarding subject matter jurisdiction may not be waived and, instead, can be raised at any time. *See C. F. Rule Constr. Co. v. Cumberland River Sand Co.*, 204 Tenn. 378, 380-81, 321 S.W.2d 791, 792 (1959) ("It is well settled that, while jurisdiction of the person may be waived or conferred by consent, jurisdiction of the subject matter can not [sic] be and the question may be raised at any stage of the proceedings."). However, the issue of whether a magistrate has been properly appointed to serve as a special judge in juvenile court has been thoroughly litigated and has never been deemed to constitute an issue of subject matter jurisdiction. *See*

*generally In re Valentine*, 79 S.W.3d 539, 545 (Tenn. 2002); ***In re J.G.H., Jr.***, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at \*9 n.11 (Tenn. Ct. App. Aug. 17, 2009); ***In re M.A.P.***, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at \*13 n.11 (Tenn. Ct. App. July 10, 2009);[17] ***Maxwell Med., Inc. v. Chumley***, 282 S.W.3d 893, 898 (Tenn. Ct. App. 2008); ***State Dep't of Children's Servs. v. F.R.G.***, No. E2006-01614-COA-R3PT, 2007 WL 494996, at \*4 (Tenn. Ct. App. Feb. 16, 2007); *see also **Ferrell v. Cigna Property & Cas. Ins. Co.***, 33 S.W.3d 731, 737–38 (Tenn. 2000) (outlining the procedure for appointing a special

---

[17] I note that in both ***In re J.G.H., Jr.*** and ***In re M.A.P.***, I filed separate dissenting opinions expressing grave concerns over the appointment process for special judges in Shelby County Juvenile Court. *See **In re J.G.H., Jr.***, 2009 WL 2502003, at \*19 (Stafford, J., dissenting); ***In re M.A.P.***, 2009 WL 2003357, at \*19 (Stafford, J., dissenting). Nothing that the Shelby County Juvenile Court has done in the intervening six years has completely abated those concerns. However, I note that the Tennessee Supreme Court appeared to have an opportunity to address my concerns in the case of ***In re Bernard T.***, 319 S.W.3d 586 (Tenn. 2010). In this Court's opinion on that cause, ***State, Dep't of Children's Servs. v. Temple***, No. W2008-02803-COA-R3-PT, 2009 WL 3681884 (Tenn. Ct. App. Nov. 5, 2009), *rev'd sub. nom. **Bernard***, 319 S.W.3d 586, the Court of Appeals considered the very issue raised by Mother: whether the special master was properly appointed to hear a case in the Shelby County Juvenile Court. Father argued on appeal that proper procedures were not followed with regard to the appointment of the special judge to preside over the termination of his parental rights. The Court of Appeals concluded that regardless of whether proper procedures were followed, the special judge "was appointed under color of law, and there is nothing in the record indicating that he acted in bad faith." ***Id.*** at \*5 (citing ***In re M.A.P.***, 2009 WL 2003357, at \*13 n.11). Accordingly, the Court of Appeals held that the failure to follow proper procedures in appointing the special judge did not require remand for a new hearing. ***Temple***, 2009 WL 3681884, at \*5. The Court went on to conclude, however, that because DCS failed to make reasonable efforts regarding reunification, termination of Father's parental rights was not proper. ***Id.*** at \*14. The Tennessee Supreme Court granted an application for permission to review and reversed the Court of Appeals' ruling regarding reasonable efforts. *See **Bernard***, 319 S.W.3d at 589. Notably, however, the Tennessee Supreme Court declined to address any argument that the special judge was improperly appointed. *See generally **id.*** at 589–607. From their decision not to address this issue, we can infer that either: (1) the issue did not concern a matter of subject matter jurisdiction, as the Court felt no duty to address it, *see* Tenn. R. App. P. 13(b) ("The appellate court shall also consider whether the trial court and appellate court have jurisdiction over the subject matter, whether or not presented for review[.]"); or (2) the Tennessee Supreme Court approved of the Court of Appeals' analysis of this issue. In either case, it appears that the Tennessee Supreme Court did not share my concerns expressed in ***In re J.G.H., Jr.*** and ***In re M.A.P.***

In addition, my concerns in this case are somewhat assuaged by the fact that, unlike in ***In re J.G.H., Jr.*** and ***In re M.A.P.***, this case involves not a termination of parental rights proceeding, but instead a dependency and neglect action. In an appeal to the circuit court of a dependency and neglect action, the circuit court judge is directed to "hear the testimony of witnesses and try the case *de novo*." ***Cornelius v. State, Dep't of Children's Servs.***, 314 S.W.3d 902, 906 (Tenn. Ct. App. 2009) (quoting Tenn. Code Ann. § 37-1-159(a)). "Consequently, the circuit court is not 'reviewing' the juvenile court's decision; instead, it is conducting a new proceeding as though the petition was originally filed in circuit court." ***Cornelius***, 314 S.W.3d at 906. There is no question that the circuit court judge was properly elected and had subject matter jurisdiction to preside over Mother's appeal. Furthermore, any errors that occurred in the juvenile court could have been corrected in the circuit court. Under these circumstances, I am less concerned than in termination cases about the appointment process for special judges in Shelby County Juvenile Court.

judge in Tennessee, but declining to state that such question involves the court's subject matter jurisdiction); *c.f. Winters v. Allen*, 166 Tenn. 281, 62 S.W.2d 51, 52 (1933) ("The rule is well settled in this state, certainly in civil cases, that a party may waive the incompetency or lack of authority to act of the trial judge, and does so waive it by implication when no objection is made at the trial and in the trial court."). Although involving a termination of parental rights case, rather than a dependency and neglect action that is followed by a *de novo* trial in the circuit court, we take instruction from this Court's Opinion in *State Department of Children's Services v. A.M.H.*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006). The *A.M.H.* Court clearly recognized the rule regarding waiver of subject matter jurisdiction arguments. *See Id.* at 762 (acknowledging, but rejecting Mother's argument the challenge to the appointment of the special master involves a question of subject matter jurisdiction that can be raised at any time) (citing Tenn. R.App. P. 13(b)). However, the Court went on to specifically hold that an argument substantially similar to Mother's argument in this case was waived by her failure to raise the issue in the juvenile court, thus indicating that the argument did not implicate the court's subject matter jurisdiction. *Id.* at 764 ("Mother did not appeal on the grounds that [the juvenile judge's] absence was unnecessary or that the paperwork concerning [the special judge's] appointment was improper or lacking; thus, these issues are deemed waived."); *see also Valentine*, 79 S.W.3d at 545 (holding that any argument regarding the special judge's "general authority" to hear the case had been waived by the failure to designate that argument as an issue on appeal); *F.R.G.*, 2007 WL 494996, at *4 (stating, in dicta, that a procedural error in designating a special judge was waived on appeal because mother failed to object in the trial court). Accordingly, we must conclude that Mother's argument concerning the Special Judge's appointment and authority to preside over the rehearing are, likewise, waived by her failure to raise these arguments in either the circuit court or the juvenile court. *See Wroe v. Greer*, 32 Tenn. 172, 173 (Tenn. 1852) (holding that, *inter alia*, an objection to the competency of a general sessions judge was waived because the objection was raised for the first time in a *de novo* appeal to the circuit court).

## Severe Abuse

Mother next argues that the trial court erred in finding that she committed severe abuse pursuant to Tennessee Code Annotated Section 37-1-102(b)(21)(a) and (b) in the dependency and neglect proceeding. According to this Court:

> The Legislature has described what constitutes dependency and neglect, the procedures and steps to be taken in making this determination, and the jurisdiction of the juvenile courts, as follows:
>
> A "dependent and neglected child" is a child:

* * *

(G) Who is suffering from abuse or neglect;

* * *

Tenn. Code Ann. § 37-1-102(b)(12).

> The General Assembly has vested juvenile courts with "exclusive original jurisdiction" to hear allegations that a child is dependent and neglected as defined above. Tenn. Code Ann. § 37–1–103(a)(1). . . . The fact that a child is dependent and neglected and the fact that a parent has engaged in severe child abuse must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c); *Tenn. Dep't of Children's Servs. v. M.S.*, No. M2003–01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar.8, 2005) (holding that despite the lack of a statutory requirement that severe child abuse be shown by clear and convincing evidence, due to the consequences of such a finding the clear and convincing standard must be applied). For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

*Cornelius v. State, Dep't of Children's Servs.*, 314 S.W.3d 902, 905–06 (Tenn. Ct. App. 2009).

In dependency and neglect cases, the General Assembly has directed that any appeal from the juvenile court is to be heard by the circuit court. Tenn. Code Ann. § 37-1-159(a). The appeal from juvenile court to circuit court in a dependency and neglect case is not the same as this Court's review of trial court decisions, as set out in the Tennessee Rules of

Appellate Procedure. That is because, by statute, the circuit court is to "hear the testimony of witnesses and try the case de novo." *Id.* While the circuit court in a dependency and neglect proceeding is permitted to consider the juvenile record, it may not rely solely on the record made before the juvenile court. *In re K.A.P.*, No. W2012-00281-COA-R3JV, 2013 WL 6665012, at *6 (Tenn. Ct. App. Dec. 17, 2013). Instead, Tennessee Code Annotated Section 37-1-159(c) provides that the circuit court must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. *Tenn. Dep't. of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006). A *de novo* trial is "[a] new trial on the entire case-that is, on both questions of fact and issues of law-conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006).

This Court reviews the trial court's findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). Whether the ultimate issues of dependency and neglect or severe child abuse have been established by clear and convincing evidence are questions of law, which we review *de novo* with no presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (holding in a termination of parental rights case that "[a]s a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment are reviewed de novo with no presumption of correctness"); *see also In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002) (holding that the question of substantial noncompliance with the requirements of a permanency plan was a question of law reviewed *de novo* with no presumption of correctness).

In this case, Mother does not appeal the trial court's finding that the child was dependent and neglected; instead, she only appeals the trial court's finding that she severely abused the child. Severe child abuse is defined as, *inter alia*:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death; [or]
>
> > (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be

17

expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; . . . .

Tenn. Code Ann. § 37-1-102(b)(21). Serious bodily injury "includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(d).

In this case, it appears that there is no dispute that the child's injuries, including the subdural hematoma, wrist fracture, and retinal hemorrhages, constitute severe bodily injury. Additionally, it does not appear that Mother is arguing that the child's injuries did not result from non-accidental trauma. Indeed, Dr. Lakin's testimony on this issue clearly states that the child's injuries were non-accidental, and there is no evidence in the record to refute that conclusion. Instead, with regard to subsection (A), Mother argues that there was insufficient evidence to meet the clear and convincing standard that she knowingly exposed the child to abuse or knowingly failed to protect the child from abuse. Further, with regard to subsection (B), Mother argues that Dr. Lakin's testimony was insufficient to show that the child's injuries are likely to produce the type of effects required by that subsection, or that Mother knowingly failed to protect the child from such harm.

We begin with an analysis of subsection (A). The evidence in the record establishes that all of the child's injuries likely occurred between Saturday evening, September 1, and Monday, September 3, 2012. Specifically, the child's Friday, August 31, 2012, pediatrician visit revealed no injuries, and maternal grandmother indicated to Ms. Harper that the child was uninjured when he left her home on Saturday or Sunday night. At trial, Ms. Harper testified that Mother was the only individual around the child on Sunday and Monday, September 2 and 3, 2012, when his injuries were most likely to have occurred. According to Ms. Harper, Mother emphasized that she was the primary caretaker of the child and the only person to care for the child after leaving maternal grandmother's house. Although Dr. Lakin could only testify as to Mother's statements regarding who was around the child on Monday, September 3, Dr. Lakin testified that Mother never gave any indication that another individual could have hurt the child, a fact which Dr. Lakin testified was important for diagnosis and treatment.

18

On appeal, Mother argues, however, that Boyfriend is the true perpetrator because he was alone with the child while Mother was taking a shower the evening before the child was taken to LeBonheur. The record indicates that Mother indeed informed Ms. Harper that Boyfriend had contact with the child during the course of the investigation into the child's injuries. However, Mother chose to delay informing Ms. Harper of this purported fact until more than a week after the child was admitted to the hospital and after the petition to find Mother guilty of severe abuse was filed. Further, nothing in the record indicates that Mother so much as suggested to Dr. Lakin that Boyfriend could have been the perpetrator of the child's injuries.

Even more importantly, Ms. Harper testified that her investigation revealed that the shower incident did not occur on the weekend in question, but on an earlier date. The trial court specifically credited Ms. Harper's testimony on this issue, finding that the shower incident "did not occur on the weekend in question." As we have explained:

> Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

*In re S.J.*, 387 S.W.3d at 591–92. Accordingly, the trial court's finding that Boyfriend was not alone with the child on Sunday, September 3, must only be supported by a preponderance of the evidence. We will not overturn a trial court's factual findings unless "the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). Based upon the unrefuted testimony of both Ms. Harper and Dr. Lakin that Mother initially repeatedly informed them that she was the only person caring for the child, we cannot conclude that the evidence preponderates against the trial court's finding that the shower episode occurred on a different weekend.[18]

---

[18] Mother argues in her brief that she was not allowed to support her contention that Boyfriend was the perpetrator of the child's injuries because she was forced to invoke her right against self-incrimination due to

Additionally, even if we were to credit Mother's assertion that Boyfriend was alone with the child on the evening of Sunday, September 2, this is simply insufficient to show that he was the perpetrator of the child's injuries. Importantly, although Dr. Lakin declined to give an exact time that the child's injuries occurred, she did opine that the injuries most likely occurred on the morning of Monday, September 3, 2012. According to Dr. Lakin, the child's injuries, particularly the liver laceration, would have caused the child to decline to eat. However, Mother indicated to Dr. Lakin that the child ate normally on the morning of Monday, September 3. This led Dr. Lakin to believe that the child's injuries likely occurred after his last feeding on Monday morning. There is no evidence in the record of any kind to suggest that Boyfriend was alone with the child, or even around the child, on the morning of Monday, September 3. All of the evidence in the record suggests that Mother alone was caring for the child at this time; however, Mother offered no plausible explanation for the child's injuries.

Unfortunately, this situation is not a rarity for this Court:

> This case presents a textbook example of the confluence of circumstances that are presented with unfortunate regularity in cases of alleged child abuse. A preverbal infant or child sustains serious injuries, the only witnesses to the injuries are the parents or caregivers who maintain that the injuries result from an innocent misunderstanding or inexplicable mystery, and testimony by medical personnel whose role is to opine as to the most likely cause of the child's injuries, not to identify the perpetrator.

*In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012). Further, with regard to the knowing element of subsection (A), this Court has explained:

---

the pending criminal charges against her. Because Mother now alleges that the charges against her have been dismissed, she asks this Court to remand for another hearing wherein she may testify. It appears from the record that Mother provided testimony on this issue during the original dependency and neglect hearing. Magistrate Hogan detailed Mother's testimony in her April 25, 2013 order finding the child dependent and neglected. The trial court clearly considered the evidence presented in the prior proceedings, as the magistrate's findings are included in the trial court's order. *See generally **In re Isaiah L.***, 340 S.W.3d 692, 707 (Tenn.Ct.App.2010) (concerning the duty of the circuit court to consider the juvenile record). Accordingly, the trial court was able to consider Mother's testimony on this issue. Further, Mother cites no law that would entitle her to a new hearing simply because pending criminal charges were dismissed. Finally, as discussed *supra*, Mother did not comply with the Rules of this Court in requesting that we consider post-judgment facts. Accordingly, this issue is without merit.

In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct intended to cause injury[.]

*Id.* at 592.

Here, Dr. Lakin similarly testified to the fact that it was not plausible "that the injury occurred in the manner described by [Mother]." *Id.* Further, Dr. Lakin testified that the child's injuries were likely the result of "significant acceleration-deceleration type mechanisms which would be very abrupt acceleration and then sudden deceleration, which we often see in such as whiplash or shaking." In a similar case, this Court held that because of the nature of the child's injuries and the parents' failure to offer any plausible explanation, the knowing element of Tennessee Code Annotated Section 37-1-102(b)(21)(A) was met. *See id.* at 593. Specifically, the Court noted:

Neither Mother nor Father offered any explanation, and of course newborn J.J. could not say who inflicted such fractures on him. But we need not have an admission by Mother or an eyewitness to find Mother responsible for J.J.'s rib fractures. The record indicates that only Mother and Father took care of J.J., and Mother conceded that she was the primary caregiver.". . . [T]estimony establishes that J.J.'s rib fractures resulted from nonaccidental trauma in the form of very hard compression. Under these circumstances, the evidence preponderates in favor of a finding that Mother either knowingly inflicted the serious bodily injury on J.J. or knowingly failed to protect him from the serious bodily injury.

*Id.* at 592–93. Likewise in this case, Dr. Lakin testified that the child's injuries resulted from nonaccidental trauma in the form of whiplash or shaking and that Mother was the child's primary caregiver. Thus, the evidence preponderates in favor of a finding that Mother knowingly inflicted serious bodily injury on the child or knowingly failed to protect the child from serious bodily injury.

Having determined that Mother knowingly exposed the child to severe bodily harm or knowingly failed to protect the child from severe bodily harm, we now consider whether "the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence . . . establish[es] clearly and convincingly that the parent committed severe child abuse." *In re Samaria S.*, 347 S.W.3d at 200 (citing *Cornelius*, 314 S.W.3d at 906–07). As previously discussed, it is undisputed that the child's injuries constitute severe bodily injury. Further, the evidence supports a finding that Mother was the sole caretaker of the child at the time he sustained his injuries. Finally, we have concluded that the evidence preponderates in favor of a finding that Mother knowingly exposed the child to severe bodily injury or knowingly failed to protect the child from severe bodily injury. "Even in the absence of an admission by Mother or direct eyewitness testimony, when we consider all of these specific underlying facts, there can be no mistake about the picture that emerges." *In re S.J.*, 387 S.W.3d at 595. The combined weight of these facts clearly and convincingly establishes that Mother committed severe abuse against the child pursuant to Tennessee Code Annotated Section 37-1-102(b)(21)(A). Mother's argument regarding Tennessee Code Annotated Section 37-1-102(b)(21)(B) is, therefore, pretermitted.

## Conclusion

Because clear and convincing evidence in the record supports the trial court's finding that Mother committed severe abuse, we affirm the decision of the trial court. Costs of this appeal are assessed against Appellant, Michelle W. Because Michelle W. is proceeding in forma pauperis in this appeal, execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE